[No. B231920. Second Dist., Div. One. Aug. 31, 2012.]

JCC DEVELOPMENT CORP., Plaintiff and Appellant, v. HYMAN LEVY, Defendant and Appellant.

**[CERTIFIED FOR PARTIAL PUBLICATION\*]**

*Pursuant to California Rules of Court, rules 8.1100 and 8.1110, this opinion is certified for publication with the exception of Discussion parts I.C. and II.

## Counsel

Weissmann Wolff Bergman Coleman Grodin & Evall, Weintraub Tobin Chediak Coleman Grodin and Steven Glaser for Plaintiff and Appellant.

Ervin Cohen & Jessup, Robert M. Waxman and Pantea Yashar for Defendant and Appellant.

## OPINION

CHANEY, J.—Plaintiff, appellant and respondent JCC Development Corp. (JCCDC) owed monies to defendant, respondent and appellant Hyman Levy under a promissory note. JCCDC paid, under protest, the amounts Levy demanded under the note. Then JCCDC sued Levy, claiming that Levy had overcharged JCCDC in interest and attorney fees purportedly incurred to collect on the note. The matter proceeded to judgment after a court trial, and Levy was deemed the prevailing party.

The trial court rejected JCCDC's claim that Levy was not entitled to collect interest under the note at the default rate (11.25 percent) after the note matured because Levy had not exercised his option to implement the default interest rate. The court agreed with Levy that the default interest rate automatically was triggered at the time the note matured, without a requirement that Levy notify JCCDC that he was exercising his option to implement the default rate. The court also rejected JCCDC's claims that Levy waived the right to implement the default interest rate and that Levy was estopped from asserting implementation of the default rate.

On appeal, JCCDC challenges the trial court's interpretation of the default remedies provisions of the promissory note. In the published portion of this opinion, we conclude the trial court erred in ruling that Levy was entitled to collect interest at the default rate after the promissory note matured. The default interest rate provision is part of an acceleration clause which was not triggered before the note matured. We reverse the judgment and remand the matter to the trial court for calculation of the amount JCCDC overpaid to Levy in interest from the time the note matured.

In his cross-appeal, Levy contends that the trial court erred in crediting JCCDC for 21 days of interest based on the court's finding that Levy's payoff demand failed to comply with Civil Code section 2943 (requiring that the payoff demand include "information reasonably necessary to calculate the payoff amount on a per diem basis"). (Civ. Code, § 2943, subd. (a)(5).) In the unpublished portion of this opinion, we reject Levy's contention but remand the matter to the trial court for recalculation of the interest credit in light of our holding that the default interest rate was not the applicable interest rate during the payoff period.

## BACKGROUND

*Facts*

JCCDC, a nonprofit public benefit corporation, operates community centers in Los Angeles County. In or about 2003, JCCDC began negotiating with potential buyers for the sale of the real property underlying one of its centers, Valley Cities Jewish Community Center, located on Burbank Boulevard in Sherman Oaks (Valley Cities). According to JCCDC, Valley Cities was not "economically viable" as a community center. JCCDC was trying to raise funds to use as operating capital and to pay off a $1.4 million bank loan. JCCDC believed that the Valley Cities property was worth about $6 million. JCCDC was willing to sell the property at a significant discount if the buyer would commit to operating a Jewish community center at the site for some period of time. JCCDC negotiated, unsuccessfully, with several potential buyers before it entered discussions with Levy in the summer of 2005.

Levy describes himself as a philanthropist. In 1974, he created a foundation to promote Jewish education and to help people in need. In 1997, through his foundation, he started a Jewish youth group called Sephardic Tradition and Recreation (S.T.A.R.). Levy discussed with JCCDC the possibility of S.T.A.R. purchasing the real property underlying Valley Cities and operating the site as a Jewish community center.

JCCDC and Levy discussed a purchase price of $2.7 million for the Valley Cities real property. JCCDC required that Levy deposit $2.7 million into an escrow account to demonstrate that Levy was serious about having S.T.A.R. purchase the property. When it became apparent that the sale would not be completed quickly, the parties agreed that the $2.7 million deposit would be converted to a loan secured by a deed of trust on the property. Levy agreed to loan the money to JCCDC in his capacity as the trustee of the Hyman Levy Revocable Trust, dated October 12, 1988, as amended and restated June 4, 1995.[1]

On or about September 28, 2005, JCCDC's president executed a promissory note secured by a deed of trust, which was drafted by Levy's counsel. Under the terms of the promissory note, JCCDC agreed to pay Levy the principal sum of $2.7 million, "with interest from the date hereof [September 28, 2005], until paid, at the rate of five percent (5%) per annum, with the full amount of principal and accrued interest due and payable on or before September 30, 2006." Other pertinent terms of the promissory note are as follows:

---

[1] Presumably, JCCDC used the proceeds from this loan to pay off the $1.4 million bank loan referenced above.

"If any payment due hereunder is not paid when due, Holder [Levy] shall have the right to declare any indebtedness or obligation referred to herein immediately due and payable, and Maker [JCCDC], and every endorser or guarantor of this Note, and every person who assumes the obligations of this Note, promises to pay to Holder all damages and costs of collection, including, without limitation, reasonable attorneys' fees, whether or not suit is filed thereon.

"Should interest not be paid when due, it shall thereafter bear like interest as principal, but such unpaid interest so compounded shall not exceed an amount equal to simple interest on the unpaid principal at the maximum rate permitted by law. All payments hereunder shall be applied, first, to any unpaid late charges, trustees' fees and attorneys' fees and costs, second, to accrued interest, and third, to principal.

"If: (i) Maker shall default in the payment of any interest, principal, or any other sums due hereunder, or (ii) Maker shall default on performance of any of the covenants, agreements, terms or provisions of the deed of trust securing this Note, or (iii) Maker shall sell, lease, convey, hypothecate, transfer, encumber or alienate the Property (defined below), or any part thereof, or any interest therein, or shall be divested of title or any interest therein in any manner or way, whether voluntarily or involuntarily, without the written consent of the Holder being first had and obtained; then, at Lender's option, all sums owing hereunder shall, at once, become immediately due and payable. Thereafter, interest shall accrue at the maximum legal rate permitted to be charged by non-exempt lenders under the usury laws of the State of California."

During the one-year term of the promissory note, JCCDC and Levy continued to negotiate a potential sale of the Valley Cities real property to Levy. The parties exchanged draft purchase agreements stating that the purchase price would be $2.7 million "payable in the form of an assumption by STAR of the $2,700,000.00 indebtedness presently owed by JCC Development Corp. Interest on said loan shall be reduced from five percent (5%) to two and one-half percent (2 1/2 %) per annum, and such interest shall be due and payable by JCC Development Corp. to LEVY or STAR, as they shall determine, at the Close of Escrow."

On September 30, 2006, when the promissory note matured, the parties were still negotiating the potential sale of the Valley Cities real property. JCCDC did not pay off the loan and Levy did not demand repayment at that time.

In January 2007, Levy expressed his frustration with the progress of the negotiations, and he demanded that JCCDC pay off the $2.7 million loan. On

January 18, 2007, Levy's counsel sent JCCDC's counsel a letter, stating in pertinent part: "Mr. Levy has asked us to express to you how disappointed he is that after all this time, we receive a revised draft of the AGREEMENT which changes a number of the fundamental deal points of the proposed transaction. [¶] Mr. Levy is willing to give the JCCDC forty-five (45) days from the date of this letter within which to refinance or otherwise pay off Mr. Levy's first mortgage on the subject property, in full. In the event the mortgage is not repaid in full within forty-five (45) days of the date of this letter, Mr. Levy will take such actions as he deems necessary."

The parties were able to move past their differences, temporarily, and negotiations resumed. In correspondence dated April 19, 2007, Levy's counsel assured JCCDC's counsel that Levy would not initiate an action to collect on the promissory note "so long as good-faith negotiations remain[ed] ongoing." Shortly thereafter, negotiations between JCCDC and Levy for the sale of the Valley Cities real property ended.

On June 7, 2007, JCCDC's counsel informed Levy's counsel that JCCDC was negotiating with potential buyers for the sale of the Valley Cities real property, and that JCCDC expected to enter into a purchase and sale agreement within about a week. JCCDC's counsel also told Levy's counsel that JCCDC expected to be able to pay off the $2.7 million loan within about a month, using the proceeds from the sale of the real property. JCCDC asked Levy to wait a month before filing a notice of default on the promissory note.

On June 19, 2007, Levy recorded a notice of default and election to sell under deed of trust. The notice of default stated that JCCDC owed Levy $3,072,643.49 as of June 13, 2007. In stating this amount, this was the first time Levy had indicated to JCCDC—albeit indirectly—that Levy believed he was owed something more than 5 percent interest under the terms of the promissory note. Levy commenced foreclosure proceedings.

On August 21, 2007, JCCDC's counsel sent an e-mail to Levy's counsel requesting that Levy provide a payoff demand on the promissory note. Levy's counsel prepared a draft payoff demand, which he sent to the title company, Trustee Corps, on August 27, 2007. In that draft, Levy indicated that JCCDC owed interest under the note at a rate of 11.25 percent, starting on October 1, 2006, the day after the loan matured, and going forward. On September 5, 2007, Trustee Corps issued a payoff demand to JCCDC stating that JCCDC owed $2.7 million in principal, $455,171.92 in interest, $15,105.25 in attorney fees and $15,221.20 in foreclosure fees, for a total of $3,185,498.37. Although Levy's draft payoff demand to Trustee Corps listed the per diem interest for the payoff period in compliance with Civil Code section 2943, Trustee Corps omitted this information when it issued the payoff demand to JCCDC. The payoff demand stated that it expired on September 30, 2007.

On September 18, 2007, JCCDC's counsel sent Levy's counsel a letter, requesting an explanation as to how the interest, attorney fees and foreclosure fees listed in the payoff demand were calculated. The letter states, in pertinent part: "The interest calculation far exceeds the 5% called for in the Note. JCCDC has no idea how Trustee Corps calculated the accrued interest, but it appears Mr. Levy is attempting to enforce a provision in the Note that, under certain circumstances, allows for interest to accrue at the maximum legal rate permitted by law that does not constitute usury. We do not believe the provision applies." JCCDC also questioned why Levy demanded $15,105.25 in attorney fees when JCCDC was "not aware of any legal services performed in connection with the proposed foreclosure proceedings." Finally, JCCDC questioned how Levy could have incurred $15,221.20 in foreclosure fees. JCCDC asserted that "nothing other than the filing of the notice of default has occurred."[2] JCCDC's counsel stated that JCCDC believed that the amount due under the promissory note was $2.97 million. JCCDC requested that Levy accept this amount in satisfaction of the debt.

Levy would not agree to accept the reduced amount JCCDC proposed. Therefore, on September 28, 2007, JCCDC paid under protest the full amount Levy demanded.[3]

*Procedural History*

In December 2008, JCCDC filed this lawsuit against Levy in Levy's capacity as the trustee of the Hyman Levy Revocable Trust. JCCDC asserted causes of action for breach of contract and money had and received. JCCDC alleged that Levy overcharged JCCDC in interest under the promissory note and in attorney fees purportedly incurred to collect on the note. JCCDC asserted that Levy could not charge interest under the note at the default rate because Levy did not "declare the entire obligation immediately due and payable and exercise the option to charge JCC[DC] the maximum rate of interest permitted by law." After Levy filed his answer to the complaint, the parties stipulated to waive jury trial and proceed with a bench trial.

In December 2009, a couple of months before trial, Levy filed a motion in limine to preclude JCCDC "from introducing any evidence of statements or conduct undertaken or made before, contemporaneous with, and/or after the

---

[2] Trustee Corps eventually refunded to JCCDC the amount that Levy had improperly demanded (and JCCDC had paid) in foreclosure fees.

[3] In order to complete the sale of the Valley Cities real property, JCCDC was obligated to the buyer to pay off Levy's loan. JCCDC sold the property for $8.1 million. JCCDC leased the property back from the buyer for one year so that JCCDC could continue to operate its Jewish community center there until it found a new location. After that year, the buyer was under no obligation to operate the property as a Jewish community center.

execution of the Note." Levy argued that, under the "clear" and "unambiguous" terms of the promissory note, the default interest rate automatically was triggered at the time the note matured, without a requirement that Levy notify JCCDC that it was exercising its option to implement the default rate. Levy pointed out that JCCDC had indicated in responses to discovery that the promissory note is the "final, complete and exclusive statement of the agreement between JCC[DC] and Levy, and that the Note is unambiguous."

JCCDC filed an opposition to the motion in limine, agreeing with Levy that the promissory note is unambiguous, but disagreeing with Levy's interpretation of the note. Under JCCDC's interpretation of the note, as set forth in its opposition to the motion in limine, when the loan matured "[a]t the end of the year, Levy had the right to declare the principal and interest due and payable. If he exercised that right and the amount owed was not paid, then the accrued interest could be added to the principal and, at Levy's option, interest could accrue on the new principal balance at the highest rate permitted by law." Accordingly, JCCDC asserted that the default interest rate was *not* automatically triggered at the time the note matured, and the note is not reasonably susceptible to Levy's interpretation.

Notwithstanding JCCDC's concession that the promissory note is unambiguous, and its argument that the trial court should adopt its interpretation of the note based on the "plain language of the note," JCCDC argued that the court should allow it to introduce extrinsic evidence supporting its interpretation of the default remedies provisions of the note. In its opposition to Levy's motion in limine, JCCDC stated: "The basic tenets of contract construction require the Court at least to take evidence of the circumstances surrounding the making of the agreement, including the object, nature and subject matter of the note, to place itself in the same situation in which the parties found themselves at the time of contracting. Additionally, evidence of Levy's conduct after September 30, 2006 [(the date the note matured)], demonstrating his practical construction of the note, is relevant to prove the parties' intent and could support a finding of waiver and/or estoppel."

On February 1, 2010, the trial court heard oral argument on Levy's motion in limine. The court questioned why it should allow JCCDC to present extrinsic evidence supporting its interpretation of the promissory note when JCCDC admitted the note was unambiguous. JCCDC's counsel responded: "If the note is reasonably susceptible to the defendant's interpretation and reasonably susceptible to the plaintiff's interpretation, then necessarily, there has to be an ambiguity."

The court then asked JCCDC's counsel for an offer of proof regarding the extrinsic evidence JCCDC sought to introduce supporting its interpretation of

the default remedies provisions of the promissory note. JCCDC's counsel referenced the language "in the note itself." The court pointed out that the terms of the note do not constitute extrinsic evidence. JCCDC's counsel brought up the negotiations for the sale of the Valley Cities real property which occurred after the promissory note matured, and the fact that Levy never mentioned during those negotiations that he believed JCCDC owed interest on the promissory note at a rate of 11.25 percent after the note matured. As set forth above, the draft purchase agreements stated that JCCDC owed Levy $2.7 million in principal and interest at a rate less than 11.25 percent.

The court granted Levy's motion in limine, concluding that it was not proper for the court to take extrinsic evidence where both sides conceded that the terms of the promissory note were unambiguous. The court also found that the extrinsic evidence JCCDC sought to introduce did not show the intent of the parties at the time the promissory note was drafted.

The court ruled that Levy's interpretation of the default remedies provisions of the promissory note is the correct one—that the default interest rate (11.25 percent) automatically was triggered at the time the note matured, without a requirement that Levy notify JCCDC that it was exercising its option to implement the default rate.

JCCDC filed a brief requesting that the trial court reconsider its ruling on Levy's motion in limine. JCCDC submitted for the court's consideration the extrinsic evidence it sought to introduce at trial in support of its interpretation of the promissory note. The court declined to reconsider its ruling.

JCCDC also filed a brief setting forth what it believed were the remaining issues to be tried. JCCDC asserted that Levy waived the right to implement the default interest rate and that Levy was estopped from asserting implementation of the default rate based on his conduct during negotiations after the promissory note matured. JCCDC also asserted that Levy was not entitled to recover attorney fees purportedly incurred in collecting on the debt because no such fees were necessary.

Levy objected to JCCDC proceeding on the issues of waiver and estoppel because JCCDC did not plead these issues, but raised them for the first time in its trial brief. The trial court overruled Levy's objection and allowed JCCDC to present a written opening statement/offer of proof on these issues. After reviewing JCCDC's written opening statement and supporting brief and Levy's reply, the court ruled that JCCDC had made a sufficient showing to proceed to trial on estoppel but not waiver. The court granted nonsuit as to JCCDC's waiver claim.

At trial, which was held May 24 through May 26, 2010, JCCDC presented evidence supporting its claims that Levy was estopped from asserting implementation of the default interest rate and that Levy was not entitled to recover attorney fees purportedly incurred in collecting on the promissory note. The court also allowed JCCDC to proceed on its claim that the payoff demand Trustee Corps issued in response to JCCDC's request did not comply with the requirements of Civil Code section 2943. JCCDC raised this particular statutory claim for the first time at trial. The court overruled Levy's objection to JCCDC's belated assertion of this claim.

On June 18, 2010, the trial court issued its statement of decision. The court ruled that JCCDC did not present sufficient evidence demonstrating that Levy was estopped from asserting the default interest rate. The court also ruled that Levy improperly charged JCCDC for attorney fees not incurred in collecting on the promissory note. Finally, the court ruled that Levy failed to provide JCCDC with "an accurate and justifiable [payoff] demand." Therefore, the court credited JCCDC "for all interest accruing during the 21 days during which the demand was outstanding." The court reiterated its prior ruling that JCCDC owed interest at a rate of 11.25 percent from the time the promissory note matured.

On July 7, 2010, the parties filed a stipulation providing, in pertinent part, that "[t]he amount of the interest to be repaid to Plaintiff is $18,365.94" and "[t]he amount of the attorney's fees to be repaid to Plaintiff is $11,918.00." Thereafter, the court determined that Levy was the prevailing party and awarded him attorney fees under the promissory note.

On February 24, 2011, the trial court entered judgment awarding JCCDC $30,283.94 in damages plus prejudgment interest, and awarding Levy $148,631.50 in attorney fees plus interest. Both JCCDC and Levy appealed from the judgment.

## DISCUSSION

### I. *JCCDC's Appeal*

JCCDC contends the trial court erred in interpreting the default remedies provisions of the promissory note.

#### A. *Motion in limine*

As a threshold matter, JCCDC challenges the trial court's decision granting Levy's motion in limine to exclude extrinsic evidence JCCDC sought to offer

to aid in interpreting the promissory note. The trial court made its ruling interpreting the note at the time it granted Levy's motion in limine.

JCCDC argues that it should be permitted to offer extrinsic evidence purportedly supporting its interpretation of the promissory note. Yet JCCDC has conceded that the note is the complete and only agreement between the parties, that the note is unambiguous, and that this court may interpret the note solely by looking at the language of the note and case law interpreting similar language.

 Moreover, JCCDC has not asked the court to consider evidence shedding light on the intentions of the parties when they entered into the promissory note or evidence shedding light on the meaning of the terms of the note. (See *Pacific Gas & E. Co. v. G. W. Thomas Drayage etc. Co.* (1968) 69 Cal.2d 33, 39–40 [69 Cal.Rptr. 561, 442 P.2d 641] ["rational interpretation" of a contract "requires at least a preliminary consideration of all credible evidence offered to prove the intention of the parties"]; see *Pacific Gas & Electric Co. v. Zuckerman* (1987) 189 Cal.App.3d 1113, 1141 [234 Cal.Rptr. 630] ["The test is not whether the agreement appears to the court to be clear and unambiguous on its face, but whether the extrinsic evidence is offered to support a meaning to which the language of the instrument is reasonably susceptible."].) JCCDC relies on Levy's conduct during negotiations for the sale of the real property and language in draft agreements regarding a sale which never came to fruition.

Accordingly, we conclude the trial court did not err in granting Levy's motion in limine and excluding the extrinsic evidence JCCDC sought to introduce. (See *Wolf v. Superior Court* (2004) 114 Cal.App.4th 1343, 1351 [8 Cal.Rptr.3d 649] [the trial court's determination whether extrinsic evidence should be admitted to aid in interpreting a contract is a question of law, subject to independent review on appeal].)

We turn now to our review of whether the trial court erred in interpreting the default remedies provisions of the promissory note. We independently review the provisions of the note. (*Parsons v. Bristol Development Co.* (1965) 62 Cal.2d 861, 865–866 [44 Cal.Rptr. 767, 402 P.2d 839].)

B. *Default interest rate provision*

When JCCDC paid off the loan under protest it paid interest at a rate of 11.25 percent from the time the loan matured (Oct. 1, 2006). Levy's demand for interest at this rate was based on his assertion that this default interest rate automatically was triggered at the time the note matured—an interpretation adopted by the trial court. For the reasons discussed below, we conclude this

interpretation is incorrect as a matter of law because the default interest provision is part of an acceleration clause which was never triggered.

As set forth above, the language in the promissory note at issue here is as follows:

"If: (i) Maker shall default in the payment of any interest, principal, or any other sums due hereunder, or (ii) Maker shall default on performance of any of the covenants, agreements, terms or provisions of the deed of trust securing this Note, or (iii) Maker shall sell, lease, convey, hypothecate, transfer, encumber or alienate the Property (defined below), or any part thereof, or any interest therein, or shall be divested of title or any interest therein in any manner or way, whether voluntarily or involuntarily, without the written consent of the Holder being first had and obtained; then, at Lender's option, all sums owing hereunder shall, at once, become immediately due and payable. *Thereafter, interest shall accrue at the maximum legal rate permitted to be charged by non-exempt lenders under the usury laws of the State of California.*" (Italics added.)

Levy does not dispute that the language in this paragraph preceding the italicized default interest rate language is an acceleration clause. It provides that if certain circumstances were to occur (e.g., JCCDC sold the property without Levy's consent or breached any term of the deed of trust), the $2.7 million principal sum, plus accrued interest, would "become immediately due and payable."[4]

Levy conceded in his respondent's brief that, once the promissory note matured and the lump-sum payment of principal and interest became due, the acceleration clause could not be triggered because there was nothing to accelerate. Levy nonetheless argues he could charge interest at the default rate after the loan matured because the default interest language is not part of the acceleration clause but is separate and apart from it. We disagree. The plain language of the note states that once one of the circumstances occurred which would accelerate the loan, "thereafter" interest could accrue at the maximum legal rate. The default interest language appears in the same paragraph as the acceleration clause and there is no indication in the note that this language relates to circumstances other than acceleration (e.g., failure to

---

[4] The acceleration clause also provides that another circumstance which would accelerate the loan is if JCCDC "default[ed] in the payment of any interest, principal, or any other sums due hereunder." Although the note did not require any installment payments, only one lump-sum payment due at the time the loan matured, Levy—the drafter of the agreement—concedes that this language has meaning within the context of the acceleration clause because there were certain sums which could have come due during the one-year term of the note (e.g., repair costs required under the deed of trust).

pay the lump-sum payment at the time the loan matured). Levy, the drafter of the agreement, could have included language stating that the default interest rate applied not only after circumstances of acceleration, but also after the loan matured and no payment was made, but he did not include such additional language.

In *In re Crystal Properties, Ltd., L.P.* (9th Cir. 2001) 268 F.3d 743, a case discussed by both JCCDC and Levy, the appellate court, applying California law, interpreted language similar to the language at issue here, and concluded that the default interest language was part of the acceleration clause and therefore was not applicable to a matured loan. The language in that case, which was included in numerous loans, some matured and some not, stated in pertinent part: " 'Should default be made in any payment provided for in this note, . . . at the option of the holder hereof and without notice or demand, the entire balance of principal and accrued interest then remaining unpaid shall become immediately due and payable, and thereafter bear interest, until paid in full, at the increased rate of five percent (5%) per annum over and above the rate contracted for herein.' " (*Id.* at p. 745.) Like Levy, the holder of the notes in that case argued that the default interest rate automatically was triggered when the loans matured because "there was no unpaid balance left to accelerate on these loans." (*Id.* at p. 753.)

The appellate court disagreed with the holder of the notes, concluding: "The two critical clauses—'should *default* be made in any payment . . .' and 'the entire balance . . . shall become immediately due and payable'— cannot be applied to a debt that has matured. Thus, as noted, *supra*, this provision is an acceleration clause in which the lender's ability to charge default interest is tied to its option to accelerate. Because on maturity there is no debt left to accelerate, [citation], the default interest provision in the debtor's note only applies to payment defaults that occur during the term of the note where the lender elects to accelerate. By its very terms, the default interest provision cannot be charged post-maturity." (*In re Crystal Properties, Ltd., L.P., supra*, 268 F.3d at p. 754.)

We asked the parties to file supplemental briefing discussing the *Crystal Properties* court's analysis regarding the applicability of the default interest provision to the matured loans. In their prior briefing the parties had only addressed that court's discussion regarding the nonmatured loans.

Levy attempts to distinguish the facts in *Crystal Properties* by pointing out that the default interest rate language in that case appeared in the same sentence as the acceleration clause, whereas in this case the default interest rate language appears in the sentence following the acceleration language. We do not find this to be a meaningful distinction. As set forth above, the

paragraph containing the default interest rate language in the promissory note at issue here includes two sentences, the sentence containing the acceleration language and the following sentence containing the default interest language. There is no language in the note indicating that the default interest language in the fifth paragraph is triggered by the first paragraph of the note, which states that the entire sum is due on September 30, 2006. As we concluded above, the plain language of the note states that once one of the circumstances occurred which would accelerate the loan, "thereafter" interest could accrue at the maximum legal rate.

Levy also attempts to distinguish the facts in *Crystal Properties* by pointing out that the loans at issue in that case called for installment payments due at various times during the term of the loan, not one lump-sum payment due upon maturity of the loan, as here. (*In re Crystal Properties, Ltd., L.P., supra*, 268 F.3d at pp. 745–746.) Levy argues an acceleration clause is "generally meaningless" in a single-payment note. The point is immaterial. Whether or not the acceleration clause here has meaning, the default interest rate provision is a part of it. Simply put, if the note could under no circumstances be accelerated, default interest could never be charged. At any rate, we disagree that the acceleration clause is meaningless in this note. The clause states that all sums would become immediately due and payable if JCCDC sold the Valley Cities real property without Levy's consent during the term of the note, which was indisputably possible. Even the portion of the clause regarding "default in the payment of any interest, principal, or any other sums due hereunder," might have come into play because there were certain sums which could have come due during the one-year term of the note (e.g., repair costs required under the deed of trust), as Levy has pointed out.

■ The promissory note here provides that if certain circumstances were to occur during the one-year term of the note (e.g., sale of the real property to a third party), "then, at Lender's option, all sums owing hereunder shall, at once, become immediately due and payable. Thereafter, interest shall accrue at the maximum legal rate permitted to be charged by non-exempt lenders under the usury laws of the State of California." Once the note matured, there was nothing to accelerate. JCCDC's failure to make payment upon maturity did not trigger the default interest rate provision which only applies to circumstances of acceleration. Thus, Levy could not charge JCCDC interest at a rate of 11.25 percent (the maximum legal rate). JCCDC owed interest at a rate of 5 percent.[5]

---

[5] In their briefing and at oral argument, the parties discussed at length whether Levy was required to make a demand for payment on the promissory note before he could charge interest at the default rate. We need not address this issue given our holding that the default interest provision is part of an acceleration clause which was never triggered.

We remand the matter to the trial court for calculation of the amount JCCDC overpaid to Levy in interest from October 1, 2006, forward.[6]

C. *Compound interest provision**

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

II. *Levy's Cross-appeal**

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

## DISPOSITION

The judgment is reversed and the matter remanded to the trial court for (1) calculation of the interest owed on the promissory note from October 1, 2006, forward at a rate of 5 percent and (2) recalculation of the amount of the 21-day interest credit to JCCDC based on an interest rate of 5 percent.[9] Neither party has challenged the $11,918.00 the trial court awarded JCCDC for attorney fees that Levy had improperly demanded in the payoff demand, and that amount is affirmed. Plaintiff JCC Development Corp. is entitled to recover its costs on appeal.

Rothschild, Acting P. J., and Johnson, J., concurred.

The petition of appellant Hyman Levy for review by the Supreme Court was denied November 20, 2012, S205884.

---

[6] Based on our conclusion that the default interest rate is not applicable, we need not review JCCDC's contentions that Levy waived the right to implement the default interest rate and that Levy was estopped from asserting implementation of the default rate.

*See footnote, *ante*, page 1522.

[9] Based on our reversal of these portions of the judgment, the trial court's determination that Levy is the prevailing party and its award of attorney fees to Levy under the promissory note necessarily must be reversed as well.