Filed 3/21/16  Ins. Co. of the West v. United Security Bank CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| INSURANCE COMPANY OF THE WEST,<br><br>    Cross-complainant and Appellant,<br><br>        v.<br><br>UNITED SECURITY BANK,<br><br>    Cross-defendant and Appellant. | F068649<br><br>(Super. Ct. No. 10CECG002913)<br><br><br>**OPINION** |

-ooOoo-

APPEAL from a judgment of the Superior Court of Fresno County.  Kristi C. Kapetan, Judge.

Humphrey, Berger & Associates, Kenneth S. Humphrey, Neil H. Berger, Danielle St. Clair and Stanley Haren for Cross-complainant and Appellant.

Wanger Jones Helsley, Scott D. Laird, Troy T. Ewell and Dylan J. Crosby for Cross-defendant and Appellant.

-ooOoo-

Cross-complainant, Insurance Company of the West (ICW), appeals from the judgment entered on its cross-complaint after the trial court granted the motion for summary judgment filed by cross-defendant, United Security Bank (Bank).  ICW contends triable issues of material fact remained about the meaning of the term "the loan matures" as it was used in the contract in issue, and whether maturity of the loan terminated Bank's obligations under the contract and barred ICW's cross-complaint for

breach of contract and conversion. ICW also challenges the exclusion of some evidence it presented with its opposition to Bank's motion. Bank cross-appeals, challenging the denial of its request for an award of attorney fees as the prevailing party. We affirm the judgment and the order denying attorney fees.

### FACTUAL AND PROCEDURAL BACKGROUND

Sanger II CA, LLC (Sanger II) proposed construction of a residential development on tract 5372 in the City of Sanger (City). As part of that project, City entered into a subdivision improvement agreement with Sanger II in which Sanger II agreed to install certain infrastructure improvements in connection with the development of the residential subdivision. The work was to be completed by August 31, 2006. The agreement required that Sanger II provide City with a performance bond in the amount of $600,000, to guarantee proper installation of the infrastructure improvements.

Sanger II and Bank entered into a construction loan agreement, in which Bank agreed to loan Sanger II up to $2,197,700 to finance construction of the subdivision development, including the infrastructure improvements. The construction loan agreement bore a maturity date of April 5, 2007. ICW issued a surety bond, which guaranteed performance by Sanger II of the installation of the infrastructure improvements required by its subdivision improvement agreement with City. Subsequently, Sanger II transferred its interest in and obligations under the construction loan agreement to Mister C. Investment Corporation, Incorporated (Mister C.).[1]

On January 4, 2006, Bank issued to ICW a set aside letter, in which Bank agreed to allocate $600,000 of the loan funds to pay the costs of the infrastructure work covered by ICW's performance bond. Bank promised that, if Sanger II failed to complete or pay for the bonded work, and ICW was required by its bond to perform Sanger II's obligations, on ICW's written demand, Bank would disburse to ICW the remaining

---

[1] Further references to Sanger II include Mister C., as its successor in interest.

2.

undisbursed balance of the loan funds, if any, in the same manner in which Bank would have made the funds available to Sanger II, for ICW to use in connection with the bonded work. The set aside letter included a provision stating that Bank's "obligations under this letter will expire and terminate upon the earliest to occur of the following events: … the loan matures."

Bank and Sanger II entered into two debt modification agreements, which together extended the maturity date of the construction loan from April 5, 2007, to July 5, 2008. On February 2, 2010, ICW sent Bank a letter, which stated City had demanded that ICW complete the remaining infrastructure improvements under the performance bond. ICW demanded that Bank honor its obligations under the set aside letter and disburse to ICW the balance of the remaining loan funds. Bank did not release any funds to ICW, asserting more than $600,000 had already been paid to Sanger II for the bonded work.

City sued Sanger II and ICW for failing to complete construction under the subdivision improvement agreement. ICW eventually settled the City's claims against it for a payment of $255,000. ICW cross-complained against Sanger II, Bank, and others. After multiple demurrers, ICW's operative pleading was its third amended cross-complaint, which alleged causes of action for breach of contract and conversion against Bank.[2] Both causes of action were based on allegations Bank failed to disburse funds to ICW as required by the set aside letter; both sought damages of $255,000.

Bank moved for summary judgment in its favor on ICW's third amended cross-complaint, asserting ICW could not establish the elements of a breach of contract because Bank's obligations under the set aside letter terminated by its terms when the loan matured, which occurred before ICW made any claim against Bank. Further, Bank contended ICW could not establish the elements of a conversion cause of action, because

---

[2]    ICW's third amended cross-complaint also originally included a cause of action for negligence against Bank, but Bank's demurrer to that cause of action was sustained without leave to amend before the trial court ruled on Bank's motion for summary judgment.

the termination of Bank's obligations under the set aside letter meant ICW was not entitled to immediate possession of any construction loan funds at the time of the alleged conversion, so those funds could not have been converted. ICW opposed the motion for summary judgment. It argued the termination provision of the set aside letter was ambiguous, and triable issues of fact remained as to its meaning. Additionally, even if Bank's obligations under the set aside letter terminated as it claimed, ICW asserted it was still entitled to pursue a claim for a breach of the set aside letter that occurred prior to termination.

After sustaining 14 of Bank's 19 objections to ICW's evidence, the trial court granted Bank's motion for summary judgment. The subsequent judgment indicated Bank was the prevailing party, entitled to its costs under Code of Civil Procedure section 1032. Bank then moved for an award of attorney fees, based on an attorney fee provision in the construction loan contract. It contended the subrogation claim ICW had attempted to state in the first and second amended cross-complaints, and the negligence cause of action it had attempted to state in the first, second, and third amended cross-complaints, actually alleged breach of the terms of the construction loan contract. Bank contended it was entitled to an award of attorney fees on the subrogation and negligence causes of action, because the construction loan contract contained a provision for recovery of attorney fees and Bank was the prevailing party on those causes of action, having disposed of them by demurrer. ICW opposed the motion for attorney fees, asserting its subrogation and negligence causes of action were not based on the construction loan agreement, to which it was not a party; further, the attorney fee provision in that agreement was not broad enough to support an award of attorney fees on a tort or noncontract cause of action, and there was no attorney fee agreement in the set aside letter on which to base an award of attorney fees. The trial court denied Bank's motion for attorney fees.

4.

ICW appeals from the judgment entered in Bank's favor.  Bank cross-appeals from the order denying it an award of attorney fees.

## *DISCUSSION*

### I.      Motion for Summary Judgment

#### A.      *Standard of review*

Summary judgment is properly granted when there is no triable issue of material fact and the moving party is entitled to judgment as a matter of law.  (Code Civ. Proc., § 437c, subd. (c).)  A moving defendant or cross-defendant can meet its burden by demonstrating that a cause of action has no merit, which it can do either by showing that one or more elements of the cause of action cannot be established or by establishing an affirmative defense to the cause of action.  (Code Civ. Proc., § 437c, subds. (o), (p)(2).)  "We review an order granting summary judgment de novo."  (*Powell v. Kleinman* (2007) 151 Cal.App.4th 112, 121 (*Powell*).)  In doing so, we "'exercise an independent review to determine if the defendant moving for summary judgment met its burden of establishing a complete defense or of negating each of the plaintiff's theories and establishing that the action was without merit.'"  (*Nazir v. United Airlines, Inc*. (2009) 178 Cal.App.4th 243, 253 (*Nazir*).)

"[W]e apply the same three-step analysis required of the trial court:  We first identify the issues framed by the pleadings, since it is these allegations to which the motion must respond.  Secondly, we determine whether the moving party has established facts which negate the opponents' claim and justify a judgment in the movant's favor.  Finally, if the summary judgment motion prima facie justifies a judgment, we determine whether the opposition demonstrates the existence of a triable, material factual issue."  (*Torres v. Reardon* (1992) 3 Cal.App.4th 831, 836.)

5.

### B.     *Breach of contract cause of action*

#### 1.     Maturity date

ICW's breach of contract cause of action alleged Bank promised in the set aside letter to allocate $600,000 of the construction loan funds to pay for costs of the work guaranteed by ICW's performance bond, and to pay to ICW any undisbursed funds if Sanger II failed to complete the improvements and ICW incurred liability under the performance bond.  It alleged Sanger II failed to complete the bonded work, City made a demand on ICW under the performance bond, and Bank failed to pay to ICW the undisbursed balance of the loan funds, even though ICW paid City $255,000 pursuant to its obligation under the performance bond.  The breach of contract cause of action alleged Bank breached the set aside letter by failing to allocate the loan funds as promised and failing to pay ICW the undisbursed balance of the loan funds at the time of ICW's demand.

Bank based its motion for summary judgment as to the breach of contract cause of action on an argument that Bank's obligations to ICW under the set aside letter terminated before ICW demanded Bank perform pursuant to that letter, because the maturity of the loan terminated Bank's obligations and the loan matured more than a year before ICW made its demand for performance.  Thus, the primary issue presented by the motion for summary judgment as to the breach of contract cause of action was whether Bank's obligations under the set aside letter, by its terms, terminated prior to the time ICW demanded disbursement of loan funds pursuant to the set aside letter based on Sanger II's failure to complete construction of the bonded improvements.

In support of its motion, Bank presented the construction loan contract and promissory note between Bank and Sanger II, the subdivision improvement agreement between City and Sanger II, two debt modification agreements between Bank and Mister C., which together extended the maturity date of the loan to July 5, 2008, the set aside letter, ICW's performance bond, and ICW's February 2, 2010, letter to Bank

6.

demanding that it disburse funds to ICW under the set aside letter. The portions of the set aside letter cited by Bank provided:

> "If the Borrower [Sanger II] fails to complete or pay for the Bonded Work in a manner which is acceptable to the Bond Obligee [City], and the Surety [ICW] is required under the Bond(s) to perform Borrower's obligations, we [Bank] will disburse to the Surety the remaining undisbursed balance of the Loan funds, if there is any, for the Surety to use at the times, and on the terms and subject to the conditions set forth in the Loan Documents, all in the same manner in which we would have made the Loan funds available to Borrower for its use in connection with the Bonded Work. We will have no obligation to disburse these Loan funds to the Surety unless we receive the Surety's written demand.…

> "This is an irrevocable commitment of Loan funds, which is not subject to recall or offset. Please understand, however, that this commitment is expressly conditioned on the closing of the Loan … and the Surety's insurance of the bond(s), as well as the conditions set forth here. Our liability, if any, under this letter will be decreased by the aggregate amount of Loan funds which we actually disburse to Borrower. Our obligations under this letter will expire and terminate upon the earliest to occur of the following events: (a) the Bond Obligee has accepted the Bonded work; (b) the loan funds being held are completely disbursed; (c) the Surety is discharged under the bond(s); (d) the bond(s) expire(s); (e) the loan matures; (f) the loan is paid in full; or (g) the original of this letter is returned to us."

Bank contended its obligations under the set aside letter terminated on the earliest of seven events, one of which was "the loan matures." Bank argued the loan matured on the maturity date set out in the loan documents. That date was originally designated as April 5, 2007, but was later extended to July 5, 2008. Because Bank had no obligation to disburse funds to ICW without a written demand, and ICW did not make a written demand for disbursement of the remaining loan funds to it until February 2010, Bank contends its obligation to ICW had expired or terminated prior to the time the demand was made. Thus, it had no obligation to disburse funds to ICW in response to its demand, so there was no breach of the set aside letter.

ICW contended the term "the loan matures" was ambiguous and should be interpreted in light of extrinsic evidence relating to its meaning. Therefore, a trial was needed in order to consider the extrinsic evidence and determine the meaning of the phrase, so a triable issue of material fact remained and the requirements for summary judgment were not met.

The set aside letter does not define the term "the loan matures." The ordinary rules of contract interpretation apply. "'The fundamental goal of contractual interpretation is to give effect to the mutual intention of the parties.' [Citations.] The mutual intention to which the courts give effect is determined by objective manifestations of the parties' intent, including the words used in the agreement, as well as extrinsic evidence of such objective matters as the surrounding circumstances under which the parties negotiated or entered into the contract; the object, nature and subject matter of the contract; and the subsequent conduct of the parties." (*Morey v. Vannucci* (1998) 64 Cal.App.4th 904, 912.) A party's subjective intent is irrelevant. (*Stewart v. Preston Pipeline Inc*. (2005) 134 Cal.App.4th 1565, 1587.)

In its separate statement of undisputed material facts, Bank included as facts: that Bank and Mister C. entered into debt modification agreements that extended the maturity date of the construction loan from April 5, 2007, to July 5, 2008, and that the construction loan matured on July 5, 2008. As evidence of these facts, it relied on the declaration of Bank's vice president/real estate construction manager, Porsche Saunders, the construction loan agreement, the promissory note, and the debt modification agreements. ICW did not file a separate statement disputing any of the facts set out by Bank as undisputed. (See Cal. Rules of Court, rule 3.1350(f), (h).) Rather, it filed only a separate statement setting out additional facts it contended were undisputed. Thus, ICW technically did not challenge Bank's statement that the loan matured on July 5, 2008. The trial court, however, did not base its decision on ICW's failure to expressly dispute

8.

that fact in its separate statement. Rather, it treated Bank's statement that the construction loan matured on July 5, 2008, as the one fact disputed by ICW.

ICW contends here, as it did in the trial court, that the term "the loan matures" is ambiguous; it asserts that, because the term is subject to interpretation, a triable issue of fact remains as to its meaning, and summary judgment was not proper because the parties had a right to present extrinsic evidence to the trier of fact to assist in resolving the dispute as to its meaning.

"When a contract is reduced to writing, the intention of the parties is to be ascertained from the writing alone, if possible." (Civ. Code, § 1639.) The "clear and explicit" meaning of the contract terms, interpreted in their "ordinary and popular sense," controls judicial interpretation, unless the words are "used by the parties in a technical sense, or unless a special meaning is given to them by usage." (Civ. Code, §§ 1638, 1644.) "'In seeking to ascertain the ordinary sense of words, courts … regularly use the phrase "ordinary dictionary definition [or meaning]" as if "ordinary" were synonymous with "dictionary." [Citations.] ... It is thus safe to say that the "ordinary" sense of a word is to be found in its dictionary definition.'" (*Stamm Theatres, Inc. v. Hartford Casualty Ins. Co*. (2001) 93 Cal.App.4th 531, 539, fn. omitted.)

Bank and the trial court invoked a dictionary definition to determine the meaning of the phrase "the loan matures." The trial court cited the definition of the term "date of maturity" found in Black's Law Dictionary: "The date when a debt falls due." (Black's Law Dict. (9th ed. 2009) p. 452, col. 2.) ICW contends a different definition is used in certain state and federal statutes, creating an ambiguity in the meaning of the term as used in the set aside letter.

ICW relies on definitions of the term "maturity date" found in Health and Safety Code section 129010 and title 12 of the United States Code section 1707. Health and Safety Code section 129010 is found in the California Health Facility Construction Loan Insurance Law, which provides an insurance program for the construction of health

9.

facilities. (Health & Saf. Code, §§ 129000, 129005.) It defines "'[m]aturity date'" as: "the date that the loan indebtedness would be extinguished if paid in accordance with periodic payments provided for by the terms of the loan." (Health & Saf. Code, § 129010, subd. (k).) The federal statute is part of a program to insure eligible residential mortgages. (12 U.S.C. §§ 1707-1715z-20.) It defines "'maturity date'" as "the date on which the mortgage indebtedness would be extinguished if paid in accordance with periodic payments provided for in the mortgage." (12 U.S.C. § 1707(c).) ICW seems to interpret these definitions as meaning the maturity date is the date on which the loan is paid in full. That is not the language used, however. The statutes do not define the maturity date as the date the loan is actually extinguished by payment in full. Rather, they make the maturity date the date the last payment is due by the terms of the loan contract. The date the last payment is due is the date the loan would be extinguished if payments were made in accordance with the periodic payments provided for in the loan agreement.

This interpretation is consistent with the dictionary definition of the term. It is also consistent with the definitions used in *Burrill v. Robert Marsh & Co.* (1934) 138 Cal.App. 101 (*Burrill*). In *Burrill*, the court cited the following dictionary and case definitions of the term "'maturity' as 'the time when a bill or note becomes due,' … 'a becoming due; termination of the period a note or other obligation has to run,'" (*id.* at p. 105) and, with respect to commercial paper, "'the time when the paper becomes due and demandable; that is the time when an action can be maintained thereon to enforce payment.'" (*Ibid.*)

Our interpretation is also in harmony with the opinion in *Jessup Farms v. Baldwin* (1983) 33 Cal.3d 639 (*Jessup Farms*), a case cited by both the parties and the trial court. In *Jessup Farms*, Holstein Heifer Ranch (HHR) executed a promissory note in 1972 for which it was the principal obligor; the plaintiffs and the defendant signed as co-obligors. Three subsequent notes were signed by HHR and the plaintiffs only. The plaintiffs sued

10.

the defendant, seeking contribution toward payment of the 1972 note. The issue was whether payments made by HHR should have been first applied to the 1972 note, extinguishing that debt and the defendant's obligation under it, rather than applying the payments ratably among the obligations, leaving a balance on the 1972 note on which the defendant was liable for contribution. (*Id*. at p. 643.) Civil Code section 1479**3** provided that, when several obligations were owed and neither debtor nor creditor expressly applied payments to a particular obligation, payments were to be applied in the order specified; the obligation earliest in date of maturity had priority over obligations maturing later. (*Jessup Farms,* at pp. 650–651.)

The plaintiffs contended that, although the 1972 note stated it was due on May 6, 1973, that note was renewed by execution of the 1973 note. (*Jessup Farms*, *supra*, 33 Cal.3d at p. 654.) They contended the renewed 1972 note, the 1973 note, and another note became due simultaneously on March 13, 1974, the date of the creditor's first demand for payment. The court concluded the 1973 note did not renew the 1972 note, both because its terms provided otherwise and because the 1972 note had matured, by its terms, prior to execution of the 1973 note. (*Id*. at p. 656.) The creditor "could have brought suit on the 1972 note as of May 6, 1973. It is settled that an obligation 'matures' when the holder of the note has a legal right to bring an action to force payment." (*Ibid*.) The court concluded the 1972 note was the earliest in date of maturity, payments should have been credited first to payment of the 1972 note, and such payments would have extinguished the 1972 obligation so that the defendant was not liable to the plaintiffs for contribution. (*Id*. at p. 659.)

Thus, the maturity date of the 1972 note was the date on which payment was due, when the creditor was entitled to bring an action for payment if payment was not made

---

**3** All further statutory references are to the Civil Code unless otherwise indicated.

timely. That was the date the court used in determining which note was earliest in date of maturity under the statute.

In *JCC Development Corp. v. Levy* (2012) 208 Cal.App.4th 1522 (*JCC Development*), JCC owed Levy money under a promissory note secured by a deed of trust. The full amount of principal and interest was due on September 30, 2006. (*Id.* at p. 1525.) The note provided that, if any payment was not made when due, Levy had the right to declare the indebtedness immediately due and payable, and thereafter interest would accrue at a higher rate. (*Id.* at p. 1526.) When the note matured on September 30, 2006, the parties were negotiating a sale of the property from JCC to Levy, and Levy did not demand payment. (*Ibid.*) Negotiations broke down and, in 2007, Levy recorded a notice of default and election to sell the property; the notice of default calculated the interest due at the higher rate applicable if Levy had accelerated the due date on JCC's default. (*Id.* at p. 1527.) JCC paid the amount under protest, then sued Levy to recover the excess interest. (*Id.* at p. 1528.)

Levy contended, and the trial court agreed, the default interest rate was triggered at the time the note matured. (*JCC Development*, *supra*, 208 Cal.App.4th at p. 1532.) On appeal, Levy conceded that, once the promissory note matured and the payment of principal and interest became due, the acceleration clause could not be triggered because there was nothing to accelerate. (*Id.* at p. 1533.) He argued the default interest rate was a separate provision from the acceleration clause, that could be invoked without acceleration of the maturity date. (*Ibid.*) The court disagreed: "The plain language of the note states that once one of the circumstances occurred which would accelerate the loan, 'thereafter' interest could accrue at the maximum legal rate.… Levy, the drafter of the agreement, could have included language stating that the default interest rate applied not only after circumstances of acceleration, but also after the loan matured and no payment was made, but he did not include such additional language." (*Id.* at pp. 1533–1534.)

12.

During the term of the loan, on default by JCC, Levy could have accelerated the due date and increased the interest rate. However, "[o]nce the note matured, there was nothing to accelerate. JCCDC's failure to make payment upon maturity did not trigger the default interest rate provision which only applies to circumstances of acceleration." (*JCC Development*, *supra*, 208 Cal.App.4th at p. 1535.)

Thus, the *JCC Development* court also interpreted the maturity date of the loan to be the date on which payment became due in full. The maturity date was not the date payment was made in full.

We conclude the trial court correctly interpreted the maturity date of the loan to be the date on which the final payment was due, that is, the maturity date designated in the promissory note, as extended by the subsequent debt modification agreements: July 5, 2008. By the plain terms of the set aside letter, Bank's obligations under the letter terminated on that date.

## 2. Extrinsic evidence

ICW contends the term "the loan matures" is ambiguous and it is entitled to submit extrinsic evidence to aid in interpretation of the term. Extrinsic evidence is admissible to resolve an ambiguity in the contract terms. (*WYDA Associates v. Merner* (1996) 42 Cal.App.4th 1702, 1710.) The decision whether to admit extrinsic evidence involves a two-step process. "'First, the court provisionally receives (without actually admitting) all credible evidence concerning the parties' intentions to determine "ambiguity," i.e., whether the language is "reasonably susceptible" to the interpretation urged by a party. If in light of the extrinsic evidence the court decides the language is "reasonably susceptible" to the interpretation urged, the extrinsic evidence is then admitted to aid in the second step—interpreting the contract. [Citation.]' [Citation.] The trial court's determination of whether an ambiguity exists is a question of law, subject to independent review on appeal. [Citation.] The trial court's resolution of an ambiguity is also a question of law if no parol evidence is admitted or if the parol evidence is not in

13.

conflict. However, where the parol evidence is in conflict, the trial court's resolution of that conflict is a question of fact and must be upheld if supported by substantial evidence. [Citation.] Furthermore, '[w]hen two equally plausible interpretations of the language of a contract may be made ... parol evidence is admissible to aid in interpreting the agreement, thereby presenting a question of fact which precludes summary judgment if the evidence is contradictory.'" (*Ibid.*)

ICW did not present any competent extrinsic evidence to demonstrate the language of the parties' agreement was reasonably susceptible to ICW's interpretation. The only evidence it offered regarding the intent of the parties as to the meaning of the term "the loan matures" was the declaration of ICW's counsel, describing the deposition testimony of Jonathan Monsor, the person who signed the set aside letter on behalf of ICW, and an excerpt of that deposition transcript. In his deposition, Monsor testified he did not recall any negotiation of the terms of the set aside letter or any discussion about when the loan matured. To him, loan maturity meant "the lender's terms and conditions in their loan agreement have been satisfied."

"The mutual intention to which the courts give effect is determined by objective manifestations of the parties' intent, including the words used in the agreement, as well as extrinsic evidence of such objective matters as the surrounding circumstances under which the parties negotiated or entered into the contract; the object, nature and subject matter of the contract; and the subsequent acts and conduct of the parties." (*City of Atascadero v. Merrill Lynch, Pierce, Fenner & Smith, Inc.* (1998) 68 Cal.App.4th 445, 474 (*Atascadero*).) The subjective, undisclosed intent or understanding of one of the parties is irrelevant to contract interpretation. (*Founding Members of the Newport Beach County Club v. Newport Beach Country Club, Inc*. (2003) 109 Cal.App.4th 944, 956 (*Founding Members*).) To the extent Monsor's belief as to the meaning of "the loan matures" represented Bank's understanding of the term, ICW did not present any evidence that his understanding was disclosed to or shared by Bank. Monsor's

14.

subjective, undisclosed belief as to the meaning of the term was irrelevant to the interpretation of the term. Consequently, there was no extrinsic evidence from which the trial court could conclude that "the loan matures" was reasonably susceptible to the interpretation ascribed to it by ICW. ICW failed to demonstrate any ambiguity raising a triable issue of fact for determination at trial.

### 3. Acceleration

ICW argues that Bank declared the loan in default and accelerated it prior to the maturity date specified in the debt modification agreements. It contends the trial court improperly engaged in fact finding and weighing of evidence by rejecting ICW's evidence of acceleration of the loan. It seems to contend acceleration of the loan prevented the loan from maturing, so its evidence raised a triable issue of fact regarding whether the loan matured on July 5, 2008. We find no merit in ICW's arguments.

"The term 'acceleration clause' refers to the provision in a promissory note or trust deed that requires payment of the total unpaid balance of the principal and interest on the occurrence of a specified event or events and before the obligation otherwise matures." (5 Miller & Starr, Cal. Real Estate (4th ed. 2015) § 13:130, p. 488.) "An acceleration clause advances the date of payment of future installments when there is default in a payment." (*Aristocrat Highway Displays, Inc. v. Stricklen* (1945) 68 Cal.App.2d 788, 791–792.) The construction loan contract and the promissory note between Sanger II and Bank provided that, if Sanger II defaulted, Bank could, at its option, "make all or any part of the amount owing … immediately due."

In its separate statement of undisputed material facts, Bank presented as an undisputed fact a statement that the loan file for the Sanger II loan contained an unexecuted letter, dated April 24, 2008, from Rhodlee Braa (chief credit officer for Bank) to Sean Castiglione and, based on the absence from the file of an executed copy of the letter and certified mail receipts showing delivery, the letter was never sent and the construction loan was never accelerated. The evidence cited in support of the statement

15.

included a copy of the unexecuted letter, which advised that the loan was in default due to "the entity name change without notifying the Bank and 5 other causes." It demanded the recipient "repay this obligation" by a specified date, and stated the total amount due by that date.

ICW did not file a separate statement disputing any of the facts presented in Bank's separate statement. Instead, ICW's separate statement of undisputed material facts presented other facts, which ICW contended were undisputed. In its separate statement, ICW asserted Sanger II was in default under the construction loan as of June 12, 2008, and Bank accelerated the due date of the loan, making it due and payable on that date. In support, it relied on a notice of default and election to sell, recorded on June 12, 2008.

In its ruling on the motion for summary judgment, the trial court stated: "On this motion, [Bank] presented evidence that it did not accelerate the debt by sending a demand letter to Sanger II. [Bank] has shown that the letter dated April 28, 2008 [*sic*] from Rhodlee Braa purporting to show that a demand was sent to Sanger II was a draft only, and was never sent. [¶] Moreover, the Notice of Default does not support finding acceleration, since it merely demanded the amount then due."

ICW's separate statement did not dispute Bank's assertion that the default letter was never sent, nor did it cite any evidence supporting such a dispute. By accepting Bank's undisputed fact and evidence, the trial court did not improperly engage in fact finding or weigh the evidence. It simply accepted the facts presented by Bank and not disputed by ICW as undisputed facts.

Even if ICW had submitted sufficient evidence to raise a triable issue regarding whether the due date of the loan was accelerated, it would not have changed the outcome of the motion. As previously discussed, the maturity date of a loan is the date by which full payment of the indebtedness must be made under the loan agreement. Thus,

16.

acceleration of the due date of all future installments of a loan, or of the unpaid balance of principal and interest, advances the maturity date of the loan.

In *Burrill*, the defendants guaranteed payment of promissory notes "at maturity, or any time thereafter." (*Burrill, supra*, 138 Cal.App. at p. 102.) The notes were payable by their terms on April 1, 1930. (*Id*. at p. 103.) The notes also contained an acceleration provision, permitting the plaintiff to make the principal and all unpaid interest immediately due and collectable in the event of a default in payment. (*Id*. at p. 105.) In 1928, when payments under the notes were in default, the plaintiff sued on the guarantees. The defendants asserted the action was premature, because they guaranteed payment at maturity, which they asserted was April 1, 1930. (*Id*. at p. 104.)

On appeal, the issue was whether the word "maturity" meant only the date specified in the note as the maturity date, or any date after which plaintiff could sue on the note, pursuant to its terms. (*Burrill*, *supra*, 138 Cal.App. at p. 105.) The court defined "'maturity' as 'the time when a bill or note becomes due,'" and "'the time when an action can be maintained thereon to enforce payment.'" (*Ibid*.) The guarantees did not promise payment on or after the specific date, April 1, 1930, but "at maturity." The court concluded the term "maturity," when read with the acceleration clauses in the notes, "should be construed to mean the date when the holder of the notes had a legal right to begin action to force payment thereof." (*Id*. at p. 106.) It rejected the defendants' argument the action was premature and affirmed the judgment for the plaintiff. Thus, the court interpreted the term "maturity" to include an accelerated maturity date.

Accordingly, if Bank declared a default and accelerated the due date of the outstanding balance of the loan, as ICW contends, then the maturity date of the loan was advanced to a date prior to July 5, 2008. In that event, Bank's obligations under the set aside letter terminated even earlier than July 5, 2008.

Thus, even if ICW could establish that the trial court erred in concluding the due date of the Sanger II loan was not accelerated by Bank, that error was not prejudicial to

17.

ICW, since Bank's obligations under the set aside letter still would have terminated prior to ICW's demand for performance by Bank.

### 4. Other arguments concerning interpretation of language

ICW argues at length that the purpose of the set aside letter does not support an interpretation that Bank's obligations under the letter terminated at the maturity date of the loan. Its arguments are not supported by evidence submitted in opposition to Bank's motion and are not consistent with the plain meaning of the language used in the set aside letter.

ICW issued its performance bond, guaranteeing performance of the construction contract by Sanger II. It claims it was induced to do so by Bank's issuance of the set aside letter. The performance bond, however, was issued prior to the Bank's issuance of the set aside letter. Even if ICW issued the performance bond in reliance on some promise of Bank to provide a set aside letter in the future (there was no evidence of such a promise cited in either party's separate statement of undisputed material facts), ICW could not have been induced to act by the terms of the set aside letter provided, or its understanding of them, since the letter had not yet been provided and there is no evidence its terms were known to ICW at the time the performance bond was issued.

ICW cites language in the set aside letter stating this is "an irrevocable commitment of Loan funds, which is not subject to recall or offset," and argues it would be reasonable to infer from this language an intent that, if Sanger II defaulted in its performance, "the funds identified in the Set Aside Letter would be available to protect ICW's interests until all the Loan funds were disbursed." The language of commitment, however, is immediately followed by language placing conditions on that commitment, and the provision terminating Bank's obligations under the letter on the earliest to occur of seven specified events, including "the loan matures" and "the loan funds being held are completely disbursed." Thus, it would not be reasonable to infer that Bank would make the funds available to ICW until all the loan funds were disbursed, when there were

18.

six other events that could terminate Bank's obligations if they occurred prior to full disbursement, including "the loan matures."

ICW discusses the seven events that could terminate Bank's obligations under the set aside letter and what its expectations would have been in those situations, to support its argument that it did not intend for Bank's obligations under the set aside letter to terminate before the loan had been paid by the borrower. The court cannot give effect to the undisclosed intent or unexpressed expectations of one party to the contract, however. (*Founding Members, supra*, 109 Cal.App.4th at p. 956.) ICW cites no evidence in the record to support its own claimed expectations. It also cites no evidence of any discussion or negotiation of the termination term, or of any expression of ICW's expectations to Bank, at the time the set aside letter was provided by Bank and accepted by ICW. Thus, we have not been cited to any evidence that both parties understood, agreed to, or shared ICW's purported expectations regarding how the termination provision would apply.

We can only interpret the set aside letter as it was written. It is not our function to insert what was omitted, omit what was inserted, make a new contract for the parties, or rewrite or alter by construction what was agreed to by the parties. (*Sass v. Hank* (1951) 108 Cal.App.2d 207, 215.) We cannot rewrite the set aside letter to make it more favorable to ICW than its actual terms justify.

The seven events set out in the set aside letter that would cause Bank's obligations to expire or terminate included "the loan matures," "the loan funds being held are completely disbursed," and "the loan is paid in full." We cannot construe "the loan matures" to mean the same as either the "the loan funds being held are completely disbursed" or "the loan is paid in full" without nullifying it as a contract term. "Courts must interpret contractual language in a manner which gives force and effect to *every* provision, and not in a way which renders some clauses nugatory, inoperative or meaningless." (*Atascadero*, *supra*, 68 Cal.App.4th at p. 473.) ICW has not demonstrated

19.

that its opposition to Bank's motion for summary judgment raised a triable issue of material fact concerning interpretation of the termination provisions of the set aside letter.

### 5. Breach occurring prior to termination

ICW contends that, even if Bank's obligations under the set aside letter terminated on the maturity date of the promissory note, ICW still had a viable breach of contract cause of action against Bank for breaches that occurred prior to that termination. ICW asserts Bank promised in the set aside letter "that it would ensure that $600,000 was, in fact, applied towards the Bonded Subdivision Improvements." ICW claims Bank breached that promise prior to the termination of its obligations under the set aside letter by failing to ensure the funds disbursed were used for the bonded work.

ICW does not cite any specific language in the set aside letter where Bank promised to ensure the $600,000 was actually used for the bonded work. In the set aside letter, Bank agreed: "[W]e agree to allocate Loan funds in the amount of $600,000 to pay the costs of the Bonded Work. We have no obligation to ensure that the Bonded Work is properly completed in a timely manner according to any required standard of workmanship. Moreover, we make no representation or warranty as to whether the amount of Loan funds being set aside will be sufficient to complete the Bonded Work or not." The language does not support ICW's assertion that Bank promised to "ensure that $600,000 was, in fact, applied" toward the bonded work.

Further, even if Bank had some obligation to see that the $600,000 allocated to the bonded work was not only disbursed for that work, but was actually applied toward that work, ICW's opposition to the motion did not present any evidence of a pre-termination breach of that obligation. Its separate statement of undisputed material facts stated that all disbursements of construction loan funds were made in or prior to November 2007. It stated that, at the time of the last disbursement in November 2007, "there was an undisbursed balance of the construction loan funds of at least $885,910.87." This "balance of the construction loan funds" could only refer to the balance remaining for the

entire construction project, rather than the bonded work alone, since the amount set aside for the bonded work was only $600,000. ICW's separate statement then asserted Bank disbursed "Construction Loan Funds" for certain work that was not included in the bonded work and for certain work that was defectively performed. It did not present undisputed facts, supported by evidence, that Bank disbursed such funds out of the $600,000 set aside for the bonded work, rather than out of the construction loan funds as a whole.

Thus, ICW did not present facts, supported by evidence, raising a triable issue of material fact concerning whether Bank breached its obligations under the set aside letter prior to termination of those obligations.

### C.    *Conversion cause of action*

"Conversion is the wrongful exercise of dominion over the personal property of another." (*Taylor v. Forte Hotels International* (1991) 235 Cal.App.3d 1119, 1124.) "The elements of a conversion [cause of] action are:  (1) plaintiff's ownership or right to possession in the property at the time of the conversion; (2) defendant's conversion by a wrongful act or disposition of plaintiff's property rights; and (3) damages." (*Chartered Bank of London v. Chrysler Corp*. (1981) 115 Cal.App.3d 755, 759–760.)  The trial court granted summary judgment as to the conversion cause of action, finding it was dependent on the breach of contract claim. ICW could not establish a right to possession of the undisbursed construction loan funds set aside for the bonded work unless it established its interpretation of the termination provisions of the contract was correct (or at least raised a triable issue of material fact regarding that interpretation). That is, ICW would not have had a right to possession of the set aside funds if Bank's obligations under the set aside letter terminated prior to any demand by ICW that Bank disburse funds to it pursuant to the terms of the set aside letter.

ICW's only argument in support of its conversion cause of action is that, if its breach of contract cause of action is viable because Bank's obligations under the set aside

21.

letter did not terminate on July 5, 2008, ICW would have had a right to immediate possession of the set aside funds when it demanded those funds from Bank. Because ICW has not raised a triable issue of fact supporting the viability of its breach of contract cause of action, it has not raised a triable issue of material fact regarding whether it had an immediate right to possession of any part of the set aside funds. Accordingly, the trial court properly granted summary judgment of the conversion cause of action.

### D. Exclusion of evidence

In reviewing a motion for summary judgment, we review the trial court's rulings on evidentiary objections using an abuse of discretion standard. (*Powell, supra*, 151 Cal.App.4th at p. 122; *Carnes v. Superior Court* (2005) 126 Cal.App.4th 688, 694.) ICW contends the trial court abused its discretion by sustaining some of Bank's evidentiary objections and excluding relevant, admissible evidence ICW submitted in opposition to Bank's motion for summary judgment.

Bank submitted written objections to 19 specific items of evidence submitted by ICW in opposition to the motion for summary judgment. The trial court sustained objections to 14 items and overruled objections to the remaining five. ICW contends the trial court erred by making a blanket ruling on the objections, without specifying the reasons for sustaining or overruling each objection. It asserts the error was prejudicial because the trial court did not consider a large amount of the evidence it presented, which supported its opposition to the motion and which, if considered, would have raised a triable issue of material fact warranting denial of the motion.

ICW cites *Twenty-Nine Palms Enterprises Corp. v. Bardos* (2012) 210 Cal.App.4th 1435 (*Twenty-Nine Palms*), for the proposition that "[w]hen a trial court issues a blanket ruling on numerous evidentiary objections without providing any reasoning, there 'is hardly a ruling, as it could not provide any meaningful basis for review.'" (*Id*. at p. 1447.) ICW contends Bank asserted multiple grounds for each objection to ICW's evidence and the trial court sustained 14 of the 19 objections without

22.

explaining its reasoning or specifying on which ground or grounds the objections were sustained.  ICW maintains the trial court's order was the type of impermissible blanket ruling rejected by *Twenty-Nine Palms*.

In *Twenty-Nine Palms*, the plaintiff moved for summary judgment.  In reply to the defendant's opposition, the plaintiff raised 39 objections to the defendant's evidence.  (*Twenty-Nine Palms*, *supra*, 210 Cal.App.4th at p. 1443.)  At the hearing of the motion, the trial court sustained all of the plaintiff's objections without explanation.  (*Id*. at pp. 1444–1445.)  The court concluded the trial court abused its discretion by doing so, although it found the error was harmless.  (*Id*. at p. 1449.)

The court noted that, when a trial court issues a blanket ruling on numerous evidentiary objections without reasoning, "the 'appellate court[] [is] left with the nebulous task of determining whether the ruling that was purportedly made was within the authority and discretion of the trial court and was correct.'" (*Twenty-Nine Palms*, *supra*, 210 Cal.App.4th at p. 1447.)  It stated:  "Although summarily ruling on numerous evidentiary rulings is a common labor-saving practice in law and motion courts, the objections in this case needed individual attention." (*Ibid*.)  The plaintiff had submitted 33 objections, 48 pages in length, to a seven-page declaration; the objections addressed large sections of the declaration, on a variety of grounds.  (*Ibid*.)  Many of the grounds were without merit, such as relevance objections to clearly relevant evidence.  (*Id*. at p. 1448.)  The court concluded:  "Given the sweeping nature of the objections …, and the problematic nature of some of the objections, … we conclude the trial court's blanket ruling sustaining all the objections, without reasoning, was an abuse of discretion." (*Id*. at p. 1449.)

The court in *Twenty-Nine Palms* relied on *Nazir* in reaching its decision.  In *Nazir*, the defendant moved for summary judgment; its reply included 764 objections to the plaintiff's opposing evidence, set forth in 324 pages.  (*Nazir, supra,* 178 Cal.App.4th. at p. 254.)  The trial court overruled the defendant's objection No. 27 and sustained the rest,

23.

without explanation.  (*Id*. at pp. 254–255.)  The appellate court found this was an abuse of discretion.  "[W]e have no hesitancy in holding that the sustaining of all but one of defendants' 764 objections was an abuse of discretion.  Put otherwise, there is no way that the trial court could properly have sustained 763 objections ""'guided and controlled … by fixed legal principles.'""  (*Id*. at p. 255.)  Some of the objections did not state any ground for the objection, 250 failed to quote the evidence that was the subject of the objection, 27 objected to the plaintiff's brief, rather than his evidence, and many were patently frivolous.  (*Id*. at p. 256.)

Here, Bank raised 14 objections to specific portions of the declaration of ICW's counsel, Stanley Haren, one objection to a portion of the declaration of Martin Hanson, a senior claims consultant for ICW, and four objections to documents of which ICW requested judicial notice.  Many of the objections to Haren's declaration were to his restatement of other evidence:  the content of documents attached as exhibits to his declaration, the content of documents produced by other parties during discovery, or statements made by witnesses in their depositions.  Unlike the situations in *Twenty-Nine Palms* and *Nazir*, the objections were only 13 pages in length, the evidence challenged was clearly identified, only 19 items of evidence were challenged, only one to three grounds for objection were identified for each item of evidence, and the objections were not patently frivolous.

Moreover, the trial court did not make a blanket ruling on all the objections.  It specified by number which objections were sustained and which were overruled.  It stated:  "Most objections have been sustained, on the bases argued by [Bank]."  We construe this to mean that most of Bank's objections were sustained and, where they were sustained, they were sustained on the grounds presented by Bank.  We do not construe it as a vague statement that the objections were mostly sustained on the grounds argued by Bank.

24.

The trial court also explained:  "However, where the exhibits attached to the declaration are able to be considered for the facts presented (such as deposition testimony, where the deposition testimony supports the fact stated), objections have been overruled to the extent possible, in an effort to construe the evidence as liberally as possible in favor of the opposing party in determining the existence of a triable issue of fact."  Thus, where Bank objected to Haren's restatement of the content of documents, such as deposition transcripts, the trial court overruled the objections when the document itself was consistent with Haren's representation.  This indicates the trial court considered each objection made, and the items to which the objection was made, and ruled on them accordingly.  It did not make a blanket ruling on the objections as a whole.  The trial court did not make the type of impermissible ruling rejected by *Twenty-Nine Palms* and *Nazir*.

ICW specifically challenges the trial court's rulings on nine of the objections.  We consider them separately.

### 1.    Objections Nos. 4, 8, 9, and 10

In these objections, Bank challenged Haren's declaration regarding Bank's production of spreadsheets entitled "Project Cost Report" in response to ICW's request for production of documents.  Bank objected to both the project cost report itself and Haren's statements about its content.  Haren represented the spreadsheets were prepared by Bank to document each disbursement of the construction loan.  He further stated the report showed the last disbursement of funds under the construction loan occurred on November 19, 2007, and set out the amounts disbursed for specific improvements.

Bank raised three objections to these items:  (1) The report and the information it contained were irrelevant to ICW's causes of action; (2) The evidence lacked foundation because the report was not properly authenticated; (3) The declarant, Haren, lacked personal knowledge of the document and its contents, and without such knowledge he

25.

could not competently give the testimony offered in the declaration. The trial court properly sustained Bank's objections Nos. 4, 8, 9, and 10.

The project cost report would be relevant, if at all, only to ICW's claim that Bank breached the set aside letter prior to termination by not ensuring proper use of the set aside funds. Because ICW has failed to identify any language in the set aside letter imposing an obligation on Bank to ensure that the set aside funds were actually used to pay for construction of the bonded work, it has not demonstrated that this evidence is relevant to resolution of the summary judgment motion.

Further, "the testimony of a witness concerning a particular matter is inadmissible unless he has personal knowledge of the matter." (Evid. Code, § 702, subd. (a).) When challenged by objection, such personal knowledge must be shown. (Evid. Code, § 702, subd. (b).) Haren's declaration attempted to set out and explain the contents of the project cost report, a document produced by another party in discovery. There was no evidence he prepared the report or had any basis in personal knowledge for his attempt to explain or interpret its content. The trial court did not abuse its discretion by sustaining the objection on the ground of lack of personal knowledge.

Bank's objection that the document was not authenticated also has merit. Evidence Code section 1401 requires authentication of a writing before it may be received in evidence, and before secondary evidence of its content may be received in evidence. (Evid. Code, § 1401, subds. (a), (b).) Thus, the project cost report was required to be authenticated before it, or Haren's statements about its content, could be received in evidence. "Authentication of a writing means (a) the introduction of evidence sufficient to sustain a finding that it is the writing that the proponent of the evidence claims it is or (b) the establishment of such facts by any other means provided by law." (Evid. Code, § 1400.)

The fact that a party produced a document in discovery does not authenticate the document. (*Kim v. Toyota Motor Corp*. (2016) 243 Cal.App.4th 1366, 1393.)

"Documents obtained in discovery in response to a request for production of documents may be used to support or oppose a motion for summary judgment, but must be presented in admissible form. This means the evidence must be (1) properly identified and authenticated.… Unless the opposing party admits the genuineness of the document, the proponent of the evidence must present declarations or other 'evidence sufficient to sustain a finding that it is the writing that the proponent of the evidence claims it is.'" (*Serri v. Santa Clara University* (2014) 226 Cal.App.4th 830, 855 (*Serri*).)

To authenticate a document produced by another party in discovery, a party may obtain an admission of its genuineness in response to a request for admissions; alternatively, it may obtain deposition testimony from the person who prepared the document. (See *Serri*, *supra*, 226 Cal.App.4th at p. 855.) When an attorney for a party does not have personal knowledge of the preparation of the document and cannot attest that it is genuine, complete, and accurate, the attorney is not competent to authenticate the document. (See *O'Laskey v. Sortino* (1990) 224 Cal.App.3d 241, 249–250, disapproved on other grounds in *Flanagan v. Flanagan* (2002) 27 Cal.4th 766, 776, fn. 4.)

There was no evidence in Haren's declaration that he prepared or had personal knowledge of the preparation of the project cost report. There was no evidence he did, or could, attest to the genuineness, completeness, or accuracy of the document. ICW presented no admission of Bank or deposition testimony of some representative of Bank establishing the document was what ICW represented it to be. Accordingly, we conclude the trial court did not abuse its discretion by sustaining Bank's objection to the admissibility of the project cost report and the statements in Haren's declaration about its content.

Moreover, the exclusion of this evidence was not prejudicial to ICW. "The trial court's error in excluding evidence is grounds for reversing a judgment only if the party appealing demonstrates a 'miscarriage of justice'—that is, that a different result would

27.

have been probable if the error had not occurred." (*Zhou v. Unisource Worldwide* (2007) 157 Cal.App.4th 1471, 1480.)  According to Haren's declaration, the purpose of the project cost report was to document each disbursement of the construction loan.  He stated that the report indicated certain amounts of the construction loan funds had been disbursed for certain work.  He did not state, and nothing in the report itself indicates, that any particular amount for any particular work was disbursed from the $600,000 set aside for the bonded work.  As a result, the information in the document and Haren's declaration were irrelevant to any issue presented by Bank's summary judgment motion and it is not reasonably probable its admission would have resulted in a different outcome of the motion.

### 2. Objections Nos. 11 and 12

Objections Nos. 11 and 12 challenged paragraphs 16 and 17 of Haren's declaration.  In those paragraphs, Haren described the deposition testimony of James Bales, whom he identified, without citation to any evidence, as "a contractor hired by Sanger II to perform the subdivision improvements on Tract 5372 that were guaranteed by ICW's performance bond to the City."  In paragraph 16, Haren stated that Bales testified that certain work he performed was performed on land that was not part of tract 5372 and was not included in the plans showing the work required on tract 5372.  In paragraph 17, Haren stated that Bales testified the improvements on tract 5372 did not include a Pacific Gas & Electric Company (PG&E) trench and he did no work for construction of a PG&E trench.  Pertinent excerpts from Bales deposition transcript were attached to Haren's declaration.

Bank objected to this testimony on the grounds it was irrelevant, it lacked foundation because the construction plans for tract 5372 were not authenticated or in evidence, it lacked personal knowledge because Bales lacked personal knowledge of the construction plans and what was included in them, and it violated the best evidence rule

because Haren's declaration presented his interpretation of Bales testimony, rather than the testimony itself.

Although the ruling on Bank's objections seemed to indicate the trial court would consider evidence, such as deposition transcripts, attached to Haren's declaration, when that evidence supported the facts stated in the declaration, the trial court expressly sustained objections Nos. 11 and 12. That ruling was neither erroneous, nor prejudicial.

As with objections Nos. 4, 8, 9, and 10, the only issue to which this evidence might have been relevant was ICW's claim that Bank breached the set aside letter prior to termination by failing to ensure proper use of the set aside funds. Because the language of the set aside letter did not impose an obligation on Bank to ensure that the set aside funds were actually used by Sanger II or to pay for construction of the bonded work, this evidence was not relevant to resolution of the summary judgment motion.

Further, Bales' deposition testimony merely indicates Bales performed certain work that was not included in the general plans for the whole project, but was included in a different set of plans; there was also a separate set of plans for a PG&E trench, but Bales did not install the trench. Even if that testimony had been considered by the trial court, it would not have changed the outcome of the motion, because it did not raise a triable issue of fact regarding whether Bank had an obligation to ensure the set aside funds were used for the bonded work or whether any of the set aside funds were improperly disbursed or used.

### 3. Objection No. 14

Bank objected to paragraph 20 of Haren's declaration, which described deposition testimony given by Monsor, the person designated by ICW as the person most knowledgeable about the set aside letter, among other things. Bank objected that the evidence was irrelevant, among other objections.

In paragraph 20, Haren asserted Monsor signed the set aside letter on behalf of ICW. He stated Monsor testified that his and ICW's understanding of the provision that

the obligations under the set aside letter would terminate when the loan matured was that those obligations would terminate when all of the terms and conditions of the loan agreement had been satisfied. Haren attached excerpts from Monsor's deposition transcript to his declaration. In the attached excerpts, Monsor testified to his understanding of the meaning of the provision.

The undisclosed intent or understanding of a party, or in this case a representative of a party, is irrelevant to contract interpretation. (*Founding Members, supra*, 109 Cal.App.4th at p. 956.) Even if Monsor's understanding represented ICW's understanding, ICW presented no evidence Monsor's understanding of the termination provision was disclosed to or discussed with Bank. In fact, the portion of Monsor's deposition transcript attached to Haren's declaration indicated otherwise: that the termination provision was not negotiated or discussed by the parties. Monsor's subjective, undisclosed belief as to the meaning of the termination provision was irrelevant to the interpretation of that provision. The trial court properly sustained Bank's objection No. 14.

### 4. Objection No. 15

Bank's objection No. 15 was directed at one paragraph of the declaration of Martin Hanson, a senior claims consultant employed by ICW. In the challenged paragraph, Hanson asserted that, after receiving a letter from City advising that Sanger II was in default of the subdivision improvement agreement, he investigated and discovered that, with minor exceptions, none of the improvements called for in that agreement had been installed or completed in a manner acceptable to City. Additionally, the estimated cost of completion of the improvements would exceed $600,000 and Sanger II, the principal on the performance bond, and its guarantors were unable or unwilling to perform or pay the cost of completion. Bank objected that the evidence was irrelevant, and that the statements regarding the work, the cost of the improvements, and the guarantors' willingness to pay lacked foundation and personal knowledge.

30.

ICW contends the evidence is relevant to the issue of damages. It asserts it incurred damage when Sanger II failed to perform the bonded work and City made a demand for performance under ICW's performance bond. Bank's motion for summary judgment, however, did not challenge whether ICW sustained damages as a result of Sanger II's failure to complete its construction obligations. The primary issue presented by Bank's motion was whether Bank's obligation under the set aside letter terminated because the loan matured prior to ICW's demand for performance under that letter. ICW has not demonstrated how the asserted facts or Hanson's evidence are relevant or material to the issues presented by Bank's motion, nor has ICW shown how the outcome of the motion would have been different if the trial court had admitted the evidence. The trial court did not abuse its discretion by sustaining objection No. 15.

### 5. Objection No. 19

ICW's undisputed material fact No. 11 stated: "ICW's performance bond provides that ICW can comply with its obligations by payment to the City." The evidence it relied on in support of this fact was ICW's performance bond, which was attached as an exhibit to ICW's third amended cross-complaint, of which Bank had requested that the trial court take judicial notice. Bank's objection No. 19 seemed to object both to the relevance of fact No. 11 and to the admissibility of the performance bond that was part of ICW's own pleading. Bank asserted the performance bond lacked foundation because a party may not rely on its own pleadings as evidence in opposition to a motion for summary judgment. (See *Parker v. Twentieth Century-Fox Film Corp.* (1970) 3 Cal.3d 176, 181.)

ICW argues that the performance bond is central to the litigation, because without it, ICW would not have requested that Bank provide a set aside letter. ICW has not demonstrated that any error in excluding the performance bond resulted in prejudice to it. Even if the performance bond was admissible because Bank acted upon it as authentic by relying on it in Bank's motion for summary judgment (Evid. Code, § 1414, subd. (b);

31.

*Ambriz v. Kelegian* (2007) 146 Cal.App.4th 1519, 1527), the performance bond was offered by ICW only to support a statement that ICW was able to comply with its obligations under the performance bond by making payment to City. ICW has not shown how that fact is relevant or material to the issues presented by Bank's motion for summary judgment. It has not demonstrated that, if the trial court had considered the performance bond as evidence supporting the statement of fact presented, there was a reasonable probability the outcome of the motion would have been different.

### 6. Conclusion

"The burden is on the appellant in every case affirmatively to show error and to show further that the error is prejudicial." (*Vaughn v. Jonas* (1948) 31 Cal.2d 586, 601.) ICW has failed to demonstrate any prejudicial error in the trial court's evidentiary rulings.

## II. Attorney Fees

In its cross-appeal, Bank challenges the trial court's denial of its motion for an award of attorney fees on ICW's negligence and subrogation causes of action.

### A. *Standard of review*

"On review of an award of attorney fees after trial, the normal standard of review is abuse of discretion. However, de novo review of such a trial court order is warranted where the determination of whether the criteria for an award of attorney fees and costs in this context have been satisfied amounts to statutory construction and a question of law." (*Carver v. Chevron U.S.A., Inc.* (2002) 97 Cal.App.4th 132, 142.) In other words, "it is a discretionary trial court decision on the propriety or amount of statutory attorney fees to be awarded, but a determination of the legal basis for an attorney fee award is a question of law to be reviewed de novo." (*Ibid.*) In this case, Bank challenges the trial court's interpretation of the statutory and contractual provisions governing its claim for attorney fees and its characterization of the causes of action ICW alleged in its cross-complaints.

32.

No disputed extrinsic evidence was submitted, so the issue presents a question of law for de novo review.

### B. *Contractual attorney fees*

"Each party to a lawsuit must pay his or her own attorney fees except where a statute or contract provides otherwise." (*Cargill, Inc. v. Souza* (2011) 201 Cal.App.4th 962, 966 (*Cargill*).) "In any action on a contract, where the contract specifically provides that attorney's fees and costs, which are incurred to enforce that contract, shall be awarded either to one of the parties or to the prevailing party, then the party who is determined to be the party prevailing on the contract, whether he or she is the party specified in the contract or not, shall be entitled to reasonable attorney's fees in addition to other costs." (§ 1717, subd. (a).) "Section 1717 was enacted to establish mutuality of remedy where a contractual provision makes recovery of attorney fees available for only one party and to prevent oppressive use of one-sided attorney fees provisions." (*Milman v. Shukhat* (1994) 22 Cal.App.4th 538, 543.) Section 1717 governs only attorney fee awards on contract causes of action. (*Exxess Electronixx v. Heger Realty Corp.* (1998) 64 Cal.App.4th 698, 708 (*Exxess*).)

Generally, attorney fees are awarded under section 1717 only when the litigation is between signatories to the contract. (*Cargill, supra*, 201 Cal.App.4th at p. 966.) "Under some circumstances, however, the reciprocity principles of Civil Code section 1717 will be applied in actions involving signatory and nonsignatory parties. [Citation.] 'Its purposes require [Civil Code] section 1717 be interpreted to further provide a reciprocal remedy for a nonsignatory defendant, sued on a contract as if he were a party to it, when a plaintiff would clearly be entitled to attorney's fees should he prevail in enforcing the contractual obligation against the defendant.'" (*Real Property Services Corp. v. City of Pasadena* (1994) 25 Cal.App.4th 375, 380 (*Real Property Services*).)

"Two situations may entitle a nonsignatory party to attorney fees. First is where the nonsignatory party 'stands in the shoes of a party to the contract.' [Citation.] Second

33.

is where the nonsignatory party is a third party beneficiary of the contract." (*Cargill*, *supra*, 201 Cal.App.4th at p. 966.) An award of attorney fees may not be imposed against a nonsignatory simply because the nonsignatory litigant asked for them in his or her pleading. (*Blickman Turkus, LP v. MF Downtown Sunnyvale, LLC* (2008) 162 Cal.App.4th 858, 898.)

Whether a contractual right to recovery of attorney fees extends to fees incurred in a tort cause of action depends upon the language of the contractual provision. (*Gil v. Mansano* (2004) 121 Cal.App.4th 739, 743 (*Gil*).) A broadly phrased attorney fee provision may support an award to the prevailing party on a tort cause of action, if the party seeking fees has prevailed within the meaning of the provision and if the type of claim is within the scope of the provision. (*Ibid.*) The reciprocity of section 1717 does not apply to attorney fees on tort causes of action, however. (*Moallem v. Coldwell Banker Com. Group, Inc.* (1994) 25 Cal.App.4th 1827, 1833 (*Moallem*).) If a contract provision is broad enough to authorize recovery of fees on a tort cause of action, but authorizes them only for one of the parties, only that party may recover its attorney fees if it prevails on the tort cause of action.

After judgment was entered in favor of Bank on ICW's third amended cross-complaint, Bank moved for an award of attorney fees pursuant to section 1717 and an attorney fees provision included in the construction loan agreement. Bank based its request on ICW's inclusion of a subrogation cause of action in its first and second amended cross-complaints, and a negligence cause of action in its first, second, and third amended cross-complaints. Although ICW was not a signatory to the construction loan agreement, Bank asserted the subrogation and negligence causes of action alleged Bank owed a duty of care to ICW arising out of the contractual provisions of the construction loan agreement. Bank contended the subrogation and negligence causes of action were disguised causes of action for breach of the construction loan contract and were therefore "on the [construction loan] contract," which authorized Bank's recovery of attorney fees.

The construction loan contract contained a provision that, on or after default, the borrower and owner (Sanger II) would "pay all expenses of the collection, enforcement or protection of [Bank's] rights and remedies under this Agreement or any other Loan Document." Bank contended it prevailed on the negligence and subrogation causes of action because they were disposed of by demurrer before the trial court granted summary judgment. Although ICW was not a signatory to the construction loan contract, Bank argued that, if ICW had prevailed on its subrogation or negligence cause of action, ICW would have been entitled to attorney fees under the provision in the construction loan contract; applying the reciprocity of section 1717, Bank contended that, when it prevailed on those causes of action, Bank was entitled to its attorney fees.

### 1. Negligence cause of action

Bank contends the negligence cause of action ICW attempted to state in the first, second, and third amended cross-complaints was actually a disguised cause of action for breach of the construction loan contract. Because Bank prevailed on the negligence cause of action, it maintains it is entitled to recover its attorney fees incurred in defense of that cause of action, based on the attorney fee provision in the construction loan contract and section 1717.

The negligence cause of action of the third amended cross-complaint alleged Bank had established written internal procedures and policies governing its administration of construction loans and disbursement of the proceeds of those loans. Bank had a duty to ICW, arising from its obligations under the set aside letter, to follow its internal procedures and policies in administering the construction loan to Sanger II, and to exercise reasonable care and skill to disburse the loan proceeds only for work actually performed by Sanger II, only for work on tract 5372, and only if all conditions for disbursement were satisfied. Bank allegedly breached those duties by disbursing construction loan funds for work that was not performed or was not properly performed. As a proximate result of Bank's negligence, none of the work guaranteed by ICW's

35.

performance bond was performed or completed by Sanger II, even though Bank disbursed construction loan funds to Sanger II for the performance of that work; as a result, ICW incurred losses, costs and expenses under its performance bond.

The negligence cause of action in the third amended cross-complaint was not a disguised cause of action for breach of the construction loan contract. It did not allege the elements of a cause of action for breach of the construction loan contract: the existence of the contract, performance by ICW or excuse for nonperformance, breach by Bank, and damages. (*First Commercial Mortgage Co. v. Reece* (2001) 89 Cal.App.4th 731, 745.) In fact, it did not even mention the construction loan contract. Rather, it alleged the negligent breach of duties arising out of the set aside letter and Bank's own policies and procedures.

The negligence cause of action of the first and second amended cross-complaint alleged the construction loan agreement between Bank and Sanger II provided Bank would only disburse loan funds after inspecting the work and determining it was properly performed. In accordance with the construction loan agreement and the set aside letter, Bank had a duty to ICW to exercise reasonable care and skill to allocate the construction loan proceeds in accordance with the nature, extent and estimated costs of the subdivision improvements as represented by Bank in the set aside letter. The second amended cross-complaint alleged the set aside letter referred to and incorporated by reference the construction loan agreement. The first and second amended cross-complaints alleged Bank breached its duty by, among other things, failing to allocate the loan proceeds in accordance with the set aside letter, carelessly inspecting the work performed by Sanger II, and negligently disbursing loan proceeds for work that was not performed or was not properly performed. As a proximate result, ICW incurred losses, costs and expenses under its performance bond.

The negligence cause of action of the first and second amended cross-complaints did not allege a cause of action for breach of the construction loan contract. It did not

36.

allege ICW was a party to or a third party beneficiary of the construction loan agreement, or was otherwise entitled to enforce the terms of that agreement. It did not allege ICW performed its obligations under that agreement. It did not directly allege that Bank breached the construction loan agreement or that ICW was thereby injured.[4] Rather, the negligence cause of action attempted to engraft some of the provisions of the construction loan contract into the set aside letter, an agreement to which ICW was a party, then allege a negligent breach of the set aside letter. The negligence cause of action alleged Bank owed ICW a duty of reasonable care arising out of the construction loan agreement and the set aside letter, which referred to and incorporated the construction loan agreement. It alleged Bank breached that duty of care, causing losses to ICW under its performance bond. We interpret the negligence cause of action as an attempt by ICW to allege a cause of action for Bank's negligence in the performance of its obligations under the set aside letter, which allegedly imposed on Bank some of the duties set out in the construction loan contract.

Generally, an action is not "'on the contract'" and section 1717 does not apply when the action alleges a tort arising out of or relating to the contract. (*Moallem, supra*, 25 Cal.App.4th at p. 1830.) For example, an action for professional negligence, which alleges breach of a duty that exists only because the parties have a contractual agreement, is not an action on the contract for purposes of section 1717. (*Loube v. Loube* (1998) 64 Cal.App.4th 421, 429–430.) Because ICW's negligence cause of action was not "on the contract," section 1717 and its provision for reciprocity did not authorize an award of attorney fees against a nonsignatory to the contract on that cause of action.

---

[4]    Bank misquotes the negligence cause of action when it states: "ICW, in its negligence claim, alleged that '[Bank] breached the CLA [construction loan agreement] by'" certain alleged conduct. The page of the record Bank cited actually alleges: "[Bank] breached its duties of care and skill to ICW by" the specified conduct.

37.

Bank contends that, even if the negligence cause of action did not allege a claim of breach of the construction loan agreement, Bank was entitled to attorney fees as the party prevailing on the negligence cause of action because the attorney fees provision in the construction loan agreement was broad enough to authorize an award of fees on a tort cause of action. ICW, however, was not a party to the construction loan contract and did not agree to the attorney fees provision. Further, the language of that provision was not broad enough to encompass an attorney fee award on a tort cause of action.

Section 1717 makes unilateral attorney fees provisions mutual in actions on the contract. Thus, if the contract provides that one party may recover its attorney fees if it prevails in litigation to enforce the contract, either party to the contract may recover its attorney fees when it is the prevailing party on the contract. In some circumstances, this reciprocity is extended to actions in which a nonsignatory sues or is sued by a signatory to the contract containing the attorney fees provision. (*Real Property Services, supra*, 25 Cal.App.4th at p. 380.) Attorney fees may be awarded to "'a nonsignatory defendant, sued on a contract as if he were a party to it, when a plaintiff would clearly be entitled to attorney's fees should he prevail in enforcing the contractual obligation against the defendant.'" (*Ibid*.) Likewise, "'[w]here a nonsignatory plaintiff sues a signatory defendant in an action on a contract and the signatory defendant prevails, the signatory defendant is entitled to attorney fees only if the nonsignatory plaintiff would have been entitled to its fees if the plaintiff had prevailed.'" (*Cargill*, *supra*, 201 Cal.App.4th at p. 967.)

The reciprocity of section 1717 applies only when attorney fees are requested by the party prevailing on the contract. It does not make a unilateral provision reciprocal on tort claims. (*Brown Bark III, L.P. v. Haver* (2013) 219 Cal.App.4th 809, 828.) "A party may recover attorney fees on a tort claim only if an attorney fee provision broad enough to cover tort claims expressly identifies that party as a party entitled to its benefits." (*Ibid*.) Thus, Bank would be entitled to an award of attorney fees on ICW's negligence

38.

cause of action only if the attorney fee provision in the construction loan contract expressly authorized Bank's recovery, from ICW or a litigant in ICW's position, of its attorney fees on a tort cause of action.

The attorney fees provision in the construction loan contract provided: "On or after Default, to the extent permitted by law, I agree to pay all expenses of collection, enforcement or protection of your rights and remedies under this Agreement or any other Loan Document." The term "I" referred to the borrower and owner, Sanger II. The term "you" referred to the construction lender, Bank. The provision is unilateral. It only authorizes an award of attorney fees in favor of Bank and against Sanger II. It does not authorize an award in favor of or against any other litigant.

Thus, if ICW had prevailed on its negligence cause of action, the attorney fee provision in the construction loan contract would not have authorized an award of attorney fees in its favor. The reciprocity provision of section 1717 would not have authorized an award to Bank, both because ICW had no entitlement to an award of attorney fees that could be made reciprocal and because the reciprocity provision does not apply to tort causes of action.

Further, the language of the attorney fee provision is too restrictive regarding the circumstances under which attorney fees may be recovered to authorize an award of attorney fees on a tort cause of action. Sanger II was only required to "pay all expenses of collection, enforcement or protection of [Bank's] rights and remedies under this Agreement or any other Loan Document." Whether attorney fees may be awarded on a tort claim depends upon the language of the contractual attorney fees provision and "'whether the type of claim is within the scope of the provision.'" (*Gil, supra*, 121 Cal.App.4th at p. 743.) "[A] broadly phrased contractual attorney fee provision may support an award to the prevailing party in a tort action." (*Ibid*.)

An attorney fees provision authorizing an award of attorney fees in an action to "enforce" the contract or its provisions does not cover tort claims. (*Gil, supra*, 121

39.

Cal.App.4th at p. 743.) Likewise, provisions for attorney fees have been held to apply only to actions "on the contract" when a purchaser agreed "'to pay all expenses, including reasonable attorney's fees … incurred in the collection, by suit or otherwise, of any amount payable under this contract'" (*Berge v. International Harvester Co*. (1983) 142 Cal.App.3d 152, 163, fn. 8) and when the parties agreed to an award of fees in an action "'to enforce the terms hereof or declare rights hereunder'" (*Exxess, supra,* 64 Cal.App.4th at pp. 708–713).

In contrast, broader attorney fee provisions, that are not limited to fees incurred to enforce the agreement or collect under it, have been held to encompass awards of attorney fees incurred in litigation of tort or other noncontract causes of action. A fee agreement entitling the prevailing party to attorney fees in an action "'arising out of the execution of this agreement'" (*Santisas v. Goodin* (1998) 17 Cal.4th 599, 603, 608), "'arising out of this agreement'" (*Adam v. DeCharon* (1995) 31 Cal.App.4th 708, 711, 712), "'relating to' the contract" (*Moallem*, *supra*, 25 Cal.App.4th at p. 1831), or "'[i]f this Agreement gives rise to a lawsuit or other legal proceeding between any of the parties hereto'" (*Xuereb v. Marcus & Millichap, Inc*. (1992) 3 Cal.App.4th 1338, 1340) is broad enough to encompass both tort and contract actions.

The contract provision in this case limits recovery to "expenses of collection, enforcement or protection of your rights and remedies under this Agreement or any other Loan Document." A tort cause of action does not enforce or protect a party's rights and remedies under a contract. (*Exxess*, *supra*, 63 Cal.App.4th at p. 709.) Accordingly, we conclude the attorney fee provision in the construction loan contract was not broad enough to encompass an award of attorney fees against ICW on its negligence cause of action.

### 2. Subrogation cause of action

Bank argues it is entitled to attorney fees on ICW's subrogation cause of action because, although ICW was a nonsignatory to the construction loan contract, it would

have been entitled to fees if it had prevailed on its subrogation claim. Pursuant to the reciprocity provisions of section 1717, Bank concludes it is therefore entitled to an award of attorney fees. For Bank's argument to have merit, ICW's subrogation claim must have been an action on the construction loan contract (the contract containing the attorney fees provision), otherwise the reciprocity of section 1717 would not apply.

Initially, we reject ICW's argument that subrogation is an equitable remedy and therefore cannot constitute a cause of action "on the contract." "In determining whether an action is 'on the contract' under section 1717, the proper focus is not on the nature of the remedy, but on the basis of the cause of action." (*Kachlon v. Markowitz* (2008) 168 Cal.App.4th 316, 347.) Although the remedy sought may be equitable, the claims may still be actions "'on the contract.'" (*Ibid*.)

"'Subrogation, a legal fiction, is broadly defined as the substitution of one person in the place of another with reference to a lawful claim or right. It is a right which is purely derivative and it permits a party who has been required to satisfy a loss created by a third party's wrongful act to step into the shoes of the loser and pursue recovery from the responsible wrongdoer.'" (*State Bar of California v. Statile* (2008) 168 Cal.App.4th 650, 662 (*Statile*).) "'"[S]ubrogation involves succession to the rights of others. Rights under subrogation are derivative rights."'" (*Id*. at p. 663.) Thus, subrogation is not itself a cause of action; it is a means by which one party (subrogee) steps into the shoes of another (subrogor) and prosecutes the latter's cause of action against the third party responsible for the loss. The cause of action may arise out of a contract or a tort.

ICW was not a party to the construction loan contract that contained the attorney fee provision. Thus, as a nonsignatory to that contract, ICW would be liable for Bank's attorney fees, incurred in the defense of its subrogation cause of action, only if the subrogation cause of action was one "on the contract" and ICW would have been entitled to an award of attorney fees if it had prevailed on that cause of action. A nonsignatory party may be entitled to attorney fees when that party stands in the shoes of a party to the

41.

contract or is a third party beneficiary of the contract. (*Cargill*, *supra*, 201 Cal.App.4th at p. 966.) The question then, is whether ICW, in making its subrogation claim against Bank, stood in the shoes of a party to the construction loan contract or was a third party beneficiary of that contract, so that an award of attorney fees could have been made in its favor if it had prevailed.

The subrogation cause of action in both the first and second amended cross-complaints was stated in one paragraph, other than the paragraph incorporating by reference all prior allegations of the pleading: "Pursuant to the doctrine of equitable subrogation, Civil Code §§ 2847 and 2848 and the liability of Sanger II and the other parties and cross-defendants under the [general indemnity agreement], ICW is entitled to recover from [Bank] the sum of the losses, costs expenses and attorney's fees ICW has incurred under its performance bond, in that said losses were proximately caused, in whole or in part, by the acts and/or omissions of [Bank], as aforesaid."

It is not clear from the allegations of the subrogation cause of action what substantive cause of action ICW was attempting to allege or which party was its alleged subrogor. The subrogation cause of action did not mention the construction loan agreement or allege any claim for breach of that agreement. It did not allege ICW was a third party beneficiary of, or stood in the shoes of any party to, the construction loan agreement. The only agreements mentioned in the subrogation cause of action were the general indemnity agreement between ICW on the one hand, and Sanger II and various other indemnitors on the other hand, and the performance bond ICW issued to City. Subrogation permits a party who paid another's loss "'to step into the shoes of the loser and pursue recovery from the responsible wrongdoer.'" (*Statile*, *supra*, 168 Cal.App.4th at p. 662.) The loss ICW had incurred under its performance bond, which it alleged it was entitled to recover from Bank, was the payment ICW made to City in settlement of City's claim that Sanger II failed to complete the bonded improvements as agreed. By paying that loss, ICW was entitled to step into City's shoes and pursue recovery from the

42.

party or parties responsible for Sanger II's failure to perform under the subdivision improvement agreement. City was not a party to the construction loan agreement, and nothing in the subrogation cause of action indicated ICW was attempting to pursue any rights or claims of City under the construction loan agreement.

The general indemnity agreement ICW entered into with Sanger II and other indemnitors, which was mentioned in the subrogation cause of action, provided that Sanger II and the other indemnitors would indemnify ICW against any losses it incurred under its performance bond. As a party to the general indemnity agreement, ICW had a direct action against Sanger II and the other indemnitors for any breach of that agreement; subrogation to another's rights was not necessary. Bank was not a party to the general indemnity agreement, so there were no rights against Bank arising out of that agreement to which ICW could have been subrogated.

Section 2847 provides: "If a surety satisfies the principal obligation, or any part thereof, whether with or without legal proceedings, the principal is bound to reimburse what he has disbursed, including necessary costs and expenses; but the surety has no claim for reimbursement against other persons, though they may have been benefited by his act, except as prescribed by the next section." Section 2848 provides: "A surety, upon satisfying the obligation of the principal, is entitled to enforce every remedy which the creditor then has against the principal to the extent of reimbursing what he has expended, and also to require all his co-sureties to contribute thereto, without regard to the order of time in which they became such." These sections, like the general indemnity agreement governed the relationship between principal and surety on the performance bond; they did not provide a basis for recovery from a third party, like Bank, of amounts paid by the surety to discharge the principal's obligation. In any event, to the extent ICW claimed these statutes entitled it to recover from Bank for amounts ICW paid under the performance bond, for which ICW contended Bank's wrongdoing was responsible, its

43.

cause of action was based on statute, not on the construction loan agreement containing the attorney fees provision.

ICW's subrogation cause of action sought to recover from Bank for the loss ICW incurred under its performance bond, which it alleged was "proximately caused, in whole or in part, by the acts and/or omissions of [Bank], as aforesaid." The aforesaid acts and omissions of Bank included allegations: that Bank breached the set aside letter by improperly disbursing the set aside construction loan funds and failing to disburse to ICW any remaining balance of those funds upon ICW's demand after Sanger II's default; that Bank converted ICW's property by failing to turn over to ICW the sum of $255,000 pursuant to the set aside letter, after Sanger II defaulted in performance of the subdivision improvement agreement, ICW paid that amount to City in settlement of its claim, and ICW demanded payment from Bank under the set aside letter; and that Bank breached its duty of care to ICW, arising out of the set aside letter and the construction loan contract, by negligently disbursing construction loan funds, causing ICW to incur losses under its performance bond.

The subrogation cause of action did not allege any breach of the construction loan contract to which ICW was allegedly subrogated. It did not allege any claim by City against Bank that ICW became subrogated to by payment under the performance bond; there are no allegations of any injury to City arising out of any breach of contract or other conduct by Bank. The subrogation cause of action did not allege a claim by Sanger II against Bank for breach of the construction loan contract, to which ICW became subrogated by paying City on behalf of Sanger II for Sanger II's failure to perform under the subdivision improvement agreement. Specifically, it did not allege that Bank failed to disburse funds to Sanger II and thereby prevented it from performing under the subdivision improvement agreement, that Bank otherwise prevented Sanger II from completing construction of the bonded improvements or caused it to default under the subdivision improvement agreement or under the construction loan agreement, or that

44.

Sanger II sustained any damage as a result of Bank's conduct. The only injury alleged in the subrogation cause of action was "the losses, costs expenses and attorney's fees ICW has incurred under its performance bond," which ICW alleged were proximately caused by the acts or omissions of Bank.

Thus, we conclude this cause of action, like the breach of contract, negligence, and conversion causes of action, sought to remedy Bank's alleged failure to perform in accordance with the set aside letter, which allegedly incorporated provisions of the construction loan agreement regarding disbursement of loan funds. It was Bank's failure to perform under the set aside letter that allegedly resulted in ICW's payment to City under the performance bond out of its own funds, rather than out of the set aside construction loan funds. We agree with the trial court's conclusion "that ICW was pressing its own claims, and that these arose from the Set Aside Letter," and ICW "was seeking damages for alleged breaches of duties [Bank] owed to ICW." (Emphasis omitted.)

Bank argues "ICW's [second amended cross-complaint] also explicitly references breaches of the [construction loan agreement] and alleges '[Bank] breached the provisions of the Construction Loan Agreement between Sanger II and [Bank]. Sanger II clearly had a right of action against [Bank] based upon a breach of the terms of the Construction Loan Agreement to which it was a party.'" The portion of the record Bank cites in support of this quotation is not the second amended cross-complaint, but ICW's opposition to Bank's demurrer to the second amended cross-complaint. The quoted language does not appear in the subrogation cause of action. Although in attempting to defend its subrogation cause of action ICW may have argued that it alleged Bank breached the construction loan agreement, the subrogation cause of action did not contain such an allegation. Bank has not pointed to any language in the first or second amended cross-complaint that makes such an allegation. The trial court sustained the demurrer to the subrogation cause of action of the second amended cross-complaint in part because it

45.

did not allege a claim by ICW either as subrogee of City or as subrogee of Sanger II. ICW did not attempt to amend this cause of action after the demurrer to the second amended cross-complaint was sustained with leave to amend, to allege that Bank breached the construction loan contract and ICW was subrogated to Sanger II's breach of contract cause of action.

Bank's request for an award of attorney fees from ICW on the subrogation cause of action was based on its assertion that the subrogation cause of action was on the construction loan contract, which contained an attorney fee provision; it argued that, although ICW was a nonsignatory to the construction loan contract, because ICW alleged a claim under that contract, the provisions of section 1717 made the attorney fee provision reciprocal and an award of attorney fees to Bank was therefore authorized by section 1717. ICW's subrogation cause of action was not "on the [construction loan] contract," however. Bank has not shown ICW would have been entitled to an award of attorney fees under the provision in the construction loan contract if ICW had prevailed on the subrogation cause of action. Consequently, the trial court's denial of Bank's motion for attorney fees on the subrogation cause of action was proper.

## *DISPOSITION*

The judgment and the order denying an award of attorney fees are affirmed. The parties will bear their own costs on appeal.

_____
HILL, P.J.

WE CONCUR:

_____
LEVY, J.

_____
PEÑA, J.